## YU CONG ENG ᴇᴛ ᴀʟ. v. TRINIDAD, COLLECTOR, ET AL.

### CERTIORARI TO THE SUPREME COURT OF THE PHILIPPINE ISLANDS.

No. 623. Argued April 12, 13, 1926.—Decided June 7, 1926.

1. The Supreme Court of the Philippine Islands has discretionary jurisdiction, under § 516, Philippine Code of Civil Procedure, to determine the validity of a new penal statute seriously affecting numerous persons and extensive property interests, by a writ of prohibition against criminal proceedings under it in the Court of First Instance, rather than await judgment in those proceedings and determine the question on review, in the usual way. P. 507.

2. Act No. 2972 of the Philippine Legislature, approved February 21, 1921, making it a crime, punishable by fine and imprisonment, for any person engaged in business for profit in the Islands to keep his account books in any language other than English, Spanish, or any local dialect, must be taken as absolutely prohibiting Chinese merchants from keeping any accounts in their own language and writing. P. 517.

3. This is made plain by the history as well as the language of the enactment. P. 513.

4. The Act is not susceptible of a construction limiting its requirement to the keeping of such account books in English, Spanish, or the Filipino dialects, as would be reasonably adapted to the needs of the taxing officials in preventing and detecting evasions of the local sales tax and other taxes, but leaving the Chinese merchant free to keep books also in Chinese. P. 515.

5. The duty of a court to construe an act of legislation in harmony with the fundamental law does not authorize the court to depart from the plain terms and intention of a statute, and thus in effect to make a new law. P. 518.

6. Especially is such a departure objectionable when the result is to introduce uncertainty into the meaning of a highly penal statute. *Id.*

7. The court may not in a criminal statute reduce its generally inclusive terms by construction so as to limit its application to that class of cases which it was within the power of the legislature to enact, and thus save the statute from invalidity. P. 522.

8. On a question of the construction of the Philippine Code of Procedure, adopted by the United States Philippine Commission, this Court, in reviewing a decision of the Supreme Court of the Philippines, may exercise its independent judgment. P. 522.

9. The application of American constitutional limitations to a Philippine statute dealing with the rights of persons living under the government established there by the United States, is not a local one, especially when the persons are the subject of another sovereignty with which the United States has made a treaty for protection of their rights. P. 523.

10. The limitations in the Philippine Bill of Rights are to be enforced in the light of the construction by this Court of such limitations as recognized by it since the foundation of our Government. P. 523.

11. In view of the history of the Islands, the large and important mercantile interests of Chinese residing there, who are unacquainted with other languages than their own, the above Act of the Legislature, in prohibiting them from maintaining a set of account books in Chinese, and thus preventing them from keeping advised of their business and directing its conduct, is not within the police power, but is arbitrary and discriminatory and deprives them of liberty and property without due process of law and denies them the equal protection of the laws, in violation of the Philippine Bill of Rights. P. 524.

Reversed.

CERTIORARI to a judgment of the Supreme Court of the Philippine Islands denying an original petition for a writ of prohibition against officials in the Philippine Islands to prevent enforcement by criminal proceedings of an Act of the Legislature making it an offense to keep business account books in any language except English, Spanish, or a Filipino dialect.

*Mr. Frederic R. Coudert,* with whom *Messrs. Allison D. Gibbs* and *Mahlon B. Doing* were on the brief, for petitioners.

Act No. 2972 is void as contrary to the prohibitions of the Philippine Bill of Rights and the Fifth Amendment to the Federal Constitution. *Balzac v. Porto Rico,* 258 U. S. 298; *Serra v. Mortiga,* 204 U. S. 470; *Tonawanda v.*

*Lyon,* 181 U. S. 389; *Kepner* v. *United States,* 195 U. S. 100; *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Lawton* v. *Steele,* 152 U. S. 133; *The King* v. *Lau Kiu,* 7 Haw. Rep. 489; *Meyer* v. *Nebraska,* 262 U. S. 390; *Terrace* v. *Thompson,* 263 U. S. 197; *Pierce* v. *Society of Sisters,* 268 U. S. 510; *Truax* v. *Raich,* 239 U. S. 33; *Adams* v. *Tanner,* 244 U. S. 590; *Southwestern Oil Co.* v. *Texas,* 217 U. S. 114; *Coppage* v. *Kansas,* 236 U. S. 1; *Burns Baking Co.* v. *Bryan,* 264 U. S. 504; *Penn. Coal Co.* v. *Mahon,* 260 U. S. 393; *Truax* v. *Corrigan,* 257 U. S. 312; *Buchanan* v. *Warley,* 245 U. S. 60; *Home Tel. & Tel. Co.* v. *Los Angeles,* 227 U. S. 278; *In re Lee Sing,* 43 Fed. 359; *In re Jacobs,* 98 N. Y. 98.

Even though the Act did not, as it obviously does, discriminate directly against the Chinese, nevertheless " the purpose of an act must be found in its natural operation and effect." *Truax* v. *Raich, supra,* at p. 40. In *Yick Wo* v. *Hopkins,* 118 U. S. 356, this Court pierced the veil of ordinances couched in the most general terms and not expressly discriminatory, and ascertained that the ordinances were in their administration directed so exclusively against a particular class of persons as to warrant and require the conclusion, that, whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the State itself, with a mind so unequal and oppressive as to amount to a practical denial by the State of the equal protection of the laws. *Mugler* v. *Kansas,* 123 U. S. 623. Other cases where this Court has looked back of the form of the statutes to find illegal classifications are, *Henderson* v. *Mayor,* 92 U. S. 259; *Bailey* v. *Alabama,* 219 U. S. 219; *Guinn* v. *United States,* 238 U. S. 347; *Penn. Coal Co.* v. *Mahon,* 260 U. S. 393. See *Quong Wing* v. *Kirkendall,* 223 U. S. 59, 63.

The Act is also void because it denies to petitioners and others similarly situated the rights, privileges and im-

munities secured to them by the treaties between the United States and China, which assure to Chinese nationals "most favored nation" treatment. *Fulco* v. *Schuylkill Stone Co.*, 169 Fed. 98.

This Court may determine the validity of the Act untrammeled by the construction adopted by the Philippine Supreme Court. That construction is clearly erroneous and wholly at variance with the plain import and language of the Act. *Philippine Sugar, etc. Co.* v. *Philippine Islands*, 247 U. S. 385; *Yick Wo* v. *Hopkins, supra; Scott* v. *McNeal*, 154 U. S. 34. The legislative debates upon this law demonstrate clearly that the keeping of all account books was intended to be prohibited, although the law itself fails entirely to define "books of account." The limitation attempted to be injected into this law by the Philippine Supreme Court, restricting its operation to indefinite and unnamed books for "taxation" purposes, clearly violates the intention of the Act.

*Mr. Paul Shipman Andrews*, Special Assistant to the Attorney General, with whom Messrs. *Gregory Hankin*, Special Assistant to the Attorney General, *Guillermo B. Guevara, A. R. Stallings, Charles R. Brice*, and *Stanley Suydam* were on the brief, for respondents.

The interpretation of the Act by the Supreme Court of the Philippines is controlling under the circumstances of this case. The lower court's findings as to the purpose of the Act, its history, and the mischief it was designed to cure, will be adopted by this Court. *De la Rama* v. *De la Rama*, 201 U. S. 303; *Reavis* v. *Fianza*, 215 U. S. 16; *Roura* v. *Philippine Islands*, 218 U. S. 386. It was proper for the lower court to interpret the Act with reference to its purpose and the mischief it was designed to cure. *Takao Ozawa* v. *United States*, 260 U. S. 178. Petitioners object to this method of interpretation. But it is submitted that under no theory of constructon are

the petitioners entitled to complain when the interpretation by the lower court involves not an extension of the scope of the statute to cover actions or persons which might not otherwise have been affected, but involves construction of the statute resulting in a narrowing of its scope and a limiting of the type of books to which its provisions were to be applicable. *Gould* v. *Gould*, 245 U. S. 151; *United States* v. *Field*, 255 U. S. 257. Indeed, in this case it was not only within the discretion of the court so to interpret the Act, but it was its duty to interpret it so as to confine it within constitutional limits. *Harriman* v. *Interstate Commerce Comm.*, 211 U. S. 407; *Federal Trade Comm.* v. *Lorillard Co.*, 264 U. S. 298; *Hill* v. *Wallace*, 259 U. S. 44.

The lower court was bound to interpret this Act in accordance with existing law in the Philippine Islands. The interpretation of a statute by the highest court of the jurisdiction, whose legislature enacted it, is binding on this Court when the effect of such interpretation is to cure constitutional difficulties which otherwise might have existed. *Philippine Sugar Co.* v. *Philippine Islands*, 247 U. S. 385; *Oceanic Steam Nav. Co.* v. *Stranahan*, 214 U. S. 320; 29 Harv. L. Rev. 582; *Londoner* v. *Denver*, 210 U. S. 373.

Act 2972 is not a deprivation of liberty or property without due process of law. The phrase " due process " takes its meaning with reference to the body of law of the jurisdiction whose legislature enacted the statute under consideration. It should be borne in mind that the Fifth Amendment does not apply to the Philippine Islands, being a limitation only on the federal Government. *Capital City Dairy Co.* v. *Ohio*, 183 U. S. 238; *Brown* v. *New Jersey*, 175 U. S. 172. It has been further held by this Court, in *Dorr* v. *United States*, 195 U. S. 138, that the Philippine Islands do not constitute an incorporated territory and that the constitutional limita-

tions affecting Congress do not apply to the Philippines nor to its governing body, which may exercise all powers delegated by the Congress. The Philippine Autonomy Act, 39 Stat. 545, provides " that no law shall be enacted in said Islands which shall deprive any persons of life, liberty or property without due process of law or deny to any person therein the equal protection of the laws." It is true that this has been interpreted by this Court in *Serra* v. *Mortiga,* 204 U. S. 470, as extending to the Philippine Islands guarantees equivalent to the due process and equal protection clauses of the federal Constitution. The connotation of due process, however, when applied to legislative acts, depends on the body of existing law in the jurisdiction. *Murray* v. *Hoboken Land Co.,* 18 How. 272; *Brown* v. *New Jersey,* 175 U. S. 172. The question whether the Act offends against the due process clause of the Philippine Bill of Rights, therefore, while it is to be tested by substantially the same principles as have been applied in similar cases in this country, must be measured not as petitioners contend by exactly the same considerations which have moved our courts in their decisions under the Fifth and Fourteenth Amendments, but rather with reference to the body of law in the Philippine Islands. The Philippine Autonomy Act did not abrogate, but continued in effect the laws already in operation at the time of its enactment.

Any injury or hardship caused by this Act is purely incidental. The requirement of due process is not a limitation on an otherwise valid exercise of the power of taxation. *Brushaber* v. *Union Pac. R. R.,* 240 U. S. 1; *French* v. *Barber Asphalt Paving Co.,* 181 U. S. 324.

Act 2972, as limited by the Supreme Court of the Philippine Islands, does not offend against the equal protection clause, either in language or in operation. Neither the wisdom of the Act, nor the motives of the legislature, undisclosed in its language or operation, are material

here. The requirement of equal protection forbids, not classification, but only arbitrary classification. Act 2972 contains no classification beyond the inclusion of all merchants and the specification of certain languages. That an Act affecting all merchants in a given territory does not constitute arbitrary classification is elementary; that the choice of languages is not an arbitrary one likewise seems obvious. English and Spanish are the official languages of the Islands. As to the native dialects, it is surely not unreasonable or arbitrary for the Government of the Philippine Islands to exert itself, in behalf of its own subjects, to the small extent required to examine their books in the native languages.

Act 2972 as limited by the Supreme Court of the Philippine Islands is sufficiently definite and certain in its requirements.

The treaty between the United States and China assuring the Chinese nationals " most favored nation " treatment has no bearing on this case.

Act 2972 is a proper exercise of the taxing power and of the police power.

MR. CHIEF JUSTICE TAFT prepared the opinion of the Court.[1]

This case comes here on a writ of certiorari to review a decision of the Supreme Court of the Philippine Islands denying an original petition for prohibition against the enforcement by criminal prosecution of Act No. 2972 of the Philippine Legislature, known as the Chinese Bookkeeping Act, on the ground of its invalidity. The petitioner, Yu Cong Eng, was charged, by information in the Court of First Instance of Manila, with its violation. He was arrested, his books were seized, and the trial was about to proceed when he and the other petitioner, Co Liam, on

---

[1] The opinion was announced by MR. JUSTICE HOLMES, the CHIEF JUSTICE being absent.

their own behalf, and on behalf of all the other Chinese merchants in the Philippines, filed the petition against the Fiscal, or Prosecuting Attorney, of Manila, and the Collector of Internal Revenue engaged in the prosecution, and against the Judge presiding.

By the Code of Civil Procedure of the Philippine Islands, § 516, the Philippine Supreme Court is granted concurrent jurisdiction in prohibition with courts of first instance over inferior tribunals or persons, and original jurisdiction over courts of first instance, when such courts are exercising functions without or in excess of their jurisdiction. It has been held by that court that the question of the validity of a criminal statute must usually be raised by a defendant in the trial court and be carried regularly in review to the Supreme Court. *Cadwallader-Gibson Lumber Company v. Del Rosario,* 26 Philippine Reports, 192. But in this case, where a new Act seriously affected numerous persons and extensive property rights, and was likely to cause a multiplicity of actions, the Supreme Court exercised its discretion to bring the issue of the Act's validity promptly before it and decide it in the interest of the orderly administration of justice. The court relied by analogy upon the cases of *Ex parte Young,* 209 U. S. 123; *Truax* v. *Raich,* 239 U. S. 33; and *Wilson* v. *New,* 243 U. S. 332. Although objection to the jurisdiction was raised by demurrer to the petition, this is now disclaimed on behalf of the respondents, and both parties ask a decision on the merits. In view of broad powers in prohibition granted to that court under the Island Code, we acquiesce in the desire of the parties.

Act No. 2972, the validity of which is attacked, was passed by the Philippine Legislature, and approved February 21, 1921. It reads as follows:

" No. 2972. An act to provide in what languages account books shall be kept, and to establish penalties for its violation.

" Be it enacted by the Senate and House of Representatives of the Philippines in legislature assembled and by the authority of the same:

" Section 1. It shall be unlawful for any person, company, partnership or corporation engaged in commerce, industry or any other activity for the purpose of profit in the Philippine Islands, in according with existing law, to keep its account books in any language other than English, Spanish, or any local dialect.

" Section 2. Any person violating the provisions of this Act shall, upon conviction, be punished by a fine of not more than ten thousand pesos, or by imprisonment for not more than two years, or both.

" Section 3. This Act shall take effect on November 1st, Nineteen Hundred and Twenty-One."

This was amended as to its date by a subsequent act and it did not take effect until January 1st, 1923. Various efforts were made to repeal the Act or amend it, but they were defeated.

The petition, after setting out the prosecution in the court of first instance, and the text of the Act, avers that the petitioner Yu Cong Eng is a Chinese merchant engaged in the wholesale lumber business in Manila; that he neither reads, writes nor understands the English or Spanish language or any local dialect; that he keeps the books of account of his business in Chinese characters; that by reason of his ignorance of the English and Spanish languages and of all local dialects he is unable to keep his books in any other language than his own; that even if he should employ a bookkeeper capable of keeping his books in the English or Spanish language, he would have no means of personally revising or ascertaining the contents or correctness of the books thus kept; that the employment of such a bookkeeper, unless he should be a linguist, would entail as a necessary consequence the employment of a translator or interpreter familiar with the

Chinese language and the language or dialect in which such books might be kept, in order to enable the petitioner to ascertain by hearsay the contents thereof; that he would be completely at the mercy of such employees, who if dishonest might cheat and defraud him of the proceeds of his business, and involve him in criminal or civil liability in its conduct; that under the provisions of the Act he is prohibited from even keeping a duplicate set of accounts in his own language, and would, in the event of the enforcement of the law, be compelled to remain in total ignorance of the status of his business; and that the enforcement of the Act would drive the petitioner and many other Chinese merchants in the Philippines, who do sixty per cent. of the business of the Islands and who are in like circumstance, out of business.

The petition avers that the other petitioner in this case, Co Liam, is a Chinese person and conducts a small general merchandise business in Manila, commonly known in the Philippines as a Chinese tienda; that he carries a stock of goods of about 10,000 pesos, or $5,000; that his sales taxes amount to from 40 to 60 pesos per quarter; that he neither reads, writes nor understands the English or Spanish languages, or any local dialect; that he keeps books of account of his small business in Chinese, the only language known to him, without the assistance of a bookkeeper; that he has been losing money for some time in the operation of his business, but that even in prosperous times his profits could never be sufficient to justify the employment of a Filipino bookkeeper, and that, without the opportunity to keep Chinese books, he would be kept completely ignorant of the changing condition of his business, were he compelled to keep his books in English, Spanish or a local dialect, and that the enforcement of the Act would drive him and all the small merchants or tienda keepers in the Islands who are Chinese out of business.

The petitioners aver that the Act, if enforced, will deprive the petitioners, and the twelve thousand Chinese merchants whom they represent, of their liberty and property without due process of law, and deny them the equal protection of the laws, in violation of the Philippine Autonomy Act of Congress of August 29, 1916, c. 416, sec. 3, 39 Stat. 546.

An amendment to the petition set up the rights of the petitioners under the treaty now in force between the United States and China, alleging that under it the petitioners are entitled to the same rights, privileges and immunities as the citizens and subjects of Great Britain and Spain, and that the treaty has the force and effect of a law of Congress, which this law violates.

An answer was filed by the Fiscal, which is a general denial of the averments of the petition as to the effect of the law. He avers that the law is valid and necessary and is only the exercise of proper legislative power, because the government of the Philippine Islands depends upon the taxes and imposts which it may collect in order to carry out its functions; and the determination of whether the mercantile operations of the merchants are or are not subject to taxation, as well as the fixing of its amount, can not and ought not to be left to the mercy of those who are to bear it; that, due to the inability of the officials of the Internal Revenue to revise and check up properly the correctness of the books of account which the Chinese merchants keep in their own language, the public treasury loses every year very large sums.

Evidence was taken on the issues made. A majority of the Supreme Court held that, if the Act were construed and enforced literally, it would probably be invalid, but, by giving it an interpretation different from the usual meaning of the words employed, it could stand. Two of the justices dissented, on the ground that the

YU CONG ENG v. TRINIDAD.     511

court had exceeded its powers and by legislation made it a different Act.

There are two tax laws from which a substantial part of the revenue of the Islands is derived. There is a sales tax of 1½ per cent. on the gross sales of businesses and occupations for which a quarterly return is required. Administrative Code, §§ 1453, etc., Act 3065. There is also an income tax. The annual revenue accruing from the sales tax is roughly ten million pesos, and that from the income tax about two millions.

Another statute is the so-called Code of Commerce, brought over from the Spanish Code, the 33d Article of which provides that all merchants shall keep a book of inventories and balances, a day book, a ledger, a copy book of telegrams, letters, etc., and such other books as may be required by special laws. Under the provisions of that code and the internal revenue law, the collector of internal revenue is authorized to require the keeping of daily records of sales, and makes regulations prescribing the manner in which the proper books, invoices and other papers should be kept, and entries made therein, by the persons subject to the sales tax. R. 1164, Act No. 2339, §§ 5, 6; Administrative Code, section 1424(j).

Chinese merchants are said to have been in the Philippines even before the arrival of the Spaniards, in 1520. The Chinese written language is an ancient language with a literature and with characters quite different from those used in European languages. There are many different native dialects in the Philippines. Forty-three is said to be the number; but there are less than a dozen of these which may be regarded as important—the Tagalog, the Visayan, with two distinct main dialects, the Ilocano, the Bical, the Pampangan, the Ibanag, the Pangasananian and the Moro. Perhaps from 7 to 10 per cent. of the Filipinos speak Spanish. A great many (how large the percentage one can not tell) of the younger people in the

Islands speak English. It is a polyglot situation, and presents many difficulties in government. Comparatively few of the Chinese speak English or Spanish or the native dialects with any facility at all, and less are able to write or to read either. But, with capacity and persistence in trade, by signs and by a patois they communicate with the Filipinos and others with whom they do business, making their calculations with the abacus, an instrument for mechanical calculation, and keeping their books in Chinese characters in ink, applied by a brush to strong paper, securely bound. They have a scientific system of double entry bookkeeping.

There are 85,000 merchants in the Philippines to whom the bookkeeping law applies. Of these, 71,000 are Filipinos who may use their own dialects; 1,500 are Americans, or British or Spanish subjects; 500 are of other foreign nationalities, most of whom know the Spanish or English language. The remainder, some 12,000 in number, are Chinese. The aggregate commercial business transacted by these is about 60 per cent. of the total business done by all the merchants in the Islands. The total amount of their sales in 1923 was more than 320 millions of pesos, distributed among 3,335 wholesale merchants, of whom 50 did a business of a million pesos each, 150 of half a million each, 400 of one hundred thousand each, and 2,735 of forty thousand each. There were 8,445 retail merchants whose annual incomes on the average would not exceed 500 pesos each. In 1913, certain revenue statistics were reported by the then collector of internal revenue to the Court of First Instance in the case of *Young* v. *Rafferty*, 33 Philippine Reports, 556, in which the validity of an order by the collector requiring the keeping of certain books by tax payers in Spanish and English was at issue. The figures given above are based on this report. The report showed that Chinese merchants paid about 60 per cent. of the taxes; but this is

now in dispute and evidence was introduced by the present collector to show that the proportion of taxes paid by them in 1918 and 1922 was much less, and that examination of the books of four hundred Chinese tax payers showed a very considerable loss probably due to evasion and fraud.

The evidence of the president of the largest company in the Philippine Islands, an American who has been twenty-one years in business in the Philippines, as to the business activities of the Chinese, was accepted by the court below as reliable. He says that the Chinese system of distribution covers the Philippine Islands through the medium of middlemen in the principal centers, and then by the small Chinese storekeepers throughout the Islands, extending even to the remotest barrios or small settlements. The Chinese are the principal distributing factors in the Philippines of imported goods and the principal gatherers of goods for exportation in the same remote places. He said that, if they were driven out of business, there would be no other system of distribution available throughout the Islands, for the reason that there are not Filipino merchants sufficiently numerous with resources and experience to provide a substitute.

The Chinese Consul General testified that not more than eight Chinese merchants in the Islands can read or write proficiently in any other language than Chinese, and that the great majority of them could not comply with the Act. The merchants' establishments are made up of young Chinese persons who come from China, begin at the beginning and are promoted from time to time to become the head of the business. The books are always kept in the Chinese language, and each Chinese establishment is completely separated from the native mode of living.

Apparently there has always been some complaint in respect of the avoidance of taxes by the Chinese, because

of the difficulty of determining what their sales tax should
be. There has always been a sales tax in the Philip-
pines. It is a method of taxation to which the people
are used. Dr. Pardo de Tavera, the Philippine Libra-
rian and Historian, testified in this case that efforts to
enforce such a law as this in the Spanish times against the
Chinese, failed and became a dead letter. Governor Gen-
eral Harrison made a general recommendation looking to
a law requiring the Chinese to keep books in other than
Chinese language so that their business might be investi-
gated, saying that, until it was done, taxes would be
evaded. Since the passage of the law in 1921, as already
said, its enforcement has been postponed. Governor
General Wood has sought to have the law repealed or
changed in such a way that exceptions might be made
to it, or that the books of the Chinese should be kept on
stamped paper with the pages registered, for the pur-
pose of making it difficult for the Chinese tax payer to
change the records of his business. Protests from the
Chinese Government, from members of the Insular Com-
mittee of the House of Representatives, from Chambers
of Commerce in the United States and elsewhere, were
brought to the attention of the Philippine Legislature,
and the repeal or modification of the law came up for
discussion, but all proposed changes were defeated. The
great weight of the evidence sustains the view that the
enforcement by criminal punishment of an inhibition
against the keeping of any Chinese books of account by
Chinese merchants in the Islands would seriously embar-
rass all of them and would drive out of business a great
number.

Nor is there any doubt that the Act, as a fiscal measure,
was chiefly directed against the Chinese merchants. The
discussion over its repeal in the Philippine Legislature
leaves no doubt on this point. So far as the other mer-
chants in the Islands are concerned, its results would be

negligible and would operate without especial burden on other classes of foreign residents. The Supreme Court in its opinion in this case refers to the Act as popularly known as the Chinese Bookkeeping Act.

Evidence was introduced on behalf of the defendants to show the difficulty of securing competent Chinese bookkeepers who could act as inspectors of Chinese books for the tax collecting authorities, and, while the failure of the government to employ a sufficient number was charged to the fact that sufficient salaries were not paid to secure them, it is undoubtedly true that a lack of proper and reliable Chinese accountants presents a real difficulty in the examination of Chinese merchants' books.

The majority of the Philippine court, in its opinion, after quoting a number of authorities showing the duty of a court, in determining whether a law is unconstitutional or not, first to give every intendment possible to its validity, and second to reach a reasonable construction by which it may be preserved, said:

" We come to the last question suggested, a construction of Act No. 2972 which allows the court legally to approve it.

"A literal application of the law would make it unlawful for any Chinese merchant to keep his account books in any language other than English, Spanish or a local dialect. The petitioners say the law is susceptible of that interpretation. But such interpretation might, and probably would, cause us to hold the law unconstitutional.

"A second interpretation is that the Chinese merchant, while permitted to keep his books of account in Chinese, must also keep another set of books in either English, Spanish or a native dialect. The respondents claim the law is susceptible of such construction. It occurs to us, however, that this construction might prove as unsatis-

factory as the first. Fraud is possible in any language. An approximation to governmental convenience and an approximation to equality in taxation is the most which may be expected.

"A third construction which is permissible in view of the history of the legislation and the wording of the statute, is, that the law only intended to require the keeping of such books as were necessary in order to facilitate governmental inspection for tax purposes. It has not escaped our notice that the law does not specify what books shall be kept. It is stated by competent witnesses that a cash book, a journal, and a ledger are indispensable books of account for an efficient system of accounting, and that, in the smaller shops, even simpler entries showing merely the daily records of sales and record of purchases of merchandise would be sufficient. The keeping of records of sales, and possibly further records of purchases, in English, Spanish or a native dialect, and the filling out of the necessary forms would serve the purpose of the Government while not being oppressive. Actually, notations in English, Spanish or a dialect of all sales in sales books, and of data in other specified forms are insisted upon by the Bureau of Internal Revenue, although as appears from Exhibit 2, it is doubtful if all Chinese merchants have complied with these regulations. The faithful observance of such rules by the Chinese is not far removed from the offer of coöperation oft made for them by the petitioners of the 'translation of the account books' oft mentioned and explained by the respondents.

" The law, in speaking of any person, company, partnership or corporation, makes use of the expression 'its account books.' Does the phrase 'its account books' mean that all the account books of the person, company, partnership or corporation must be kept exclusively in English, Spanish or any local dialect? The petitioners

argue that the law has this meaning. Or does the phrase 'its account books' mean that the persons, company, partnership or corporation shall keep duplicate sets of account books, one set in Chinese and the other a translation into English, Spanish or any local dialect? Counsel for the respondents urge this construction of the law upon the court. Or does the phrase 'its account books' mean that the person, company, partnership or corporation must keep such account books as are necessary for taxation purposes? This latter interpretation occurs to us as a reasonable one and as best safeguarding the rights of the accused."

The court in effect concludes that what the Legislature meant to do was to require the keeping of such account books in English, Spanish or the Filipino dialects as would be reasonably adapted to the needs of the taxing officers in preventing and detecting evasion of taxes, and that this might be determined from the statutes and regulations then in force. What the court really does is to change the law from one which, by its plain terms, forbids the Chinese merchants to keep their account books in any language except English, Spanish or the Filipino dialects, and thus forbids them to keep account books in the Chinese, into a law requiring them to keep certain undefined books in the permitted languages. This is to change a penal prohibitive law to a mandatory law of great indefiniteness, to conform to what the Court assumes was, or ought to have been, the purpose of the Legislature, and which in the change would avoid a conflict with constitutional restriction.

It would seem to us, from the history of the legislation and the efforts for its repeal or amendment, that the Philippine Legislature knew the meaning of the words it used, and intended that the Act as passed should be prohibitory and should forbid the Chinese merchants from keeping the account books of their business in Chinese.

Had the Legislature intended only what the Supreme Court has construed it to mean, why should it not have amended it accordingly? Apparently the Legislature thought the danger to the revenue was in the secrecy of the Chinese books, and additional books in the permitted languages would not solve the difficulty.

We fully concede that it is the duty of a court in considering the validity of an act to give it such reasonable construction as can be reached to bring it within the fundamental law. But it is very clear that amendment may not be substituted for construction, and that a court may not exercise legislative functions to save the law from conflict with constitutional limitation.

One of the strongest reasons for not making this law a nose of wax to be changed from that which the plain language imports, is the fact that it is a highly penal statute authorizing sentence of one convicted under it to a fine of not more than 10,000 pesos, or by imprisonment for not more than two years, or both. If we change it to meet the needs suggested by other laws and fiscal regulations and by the supposed general purpose of the legislation, we are creating by construction a vague requirement, and one objectionable in a criminal statute. We are likely thus to trespass on the provision of the Bill of Rights that the accused is entitled to demand the nature and cause of the accusation against him; and to violate the principle that a statute which requires the doing of an act so indefinitely described that men must guess at its meaning, violates due process of law. *Connally* v. *Construction Company,* 269 U. S. 385; *United States* v. *Cohen Grocery Company;* 255 U. S. 81; *International Harvester Co.* v. *Kentucky,* 234 U. S. 216; *United States* v. *Reese,* 92 U. S. 214, 219.

The main objection to the construction given to the Act by the court below is that; in making the Act indefinitely mandatory instead of broadly prohibitory, it creates a

restriction upon its operation to make it valid that is not in any way suggested by its language. In several cases this Court has pointed out that such strained construction, in order to make a law conform to a constitutional limitation, can not be sustained.

In *United States* v. *Reese,* 92 U. S. 214, the question for decision arose on a demurrer to an indictment against inspectors of municipal election for refusing to receive and count the vote of a colored man. The power of Congress to forbid such an act was confined under the Fifteenth Amendment to a refusal to receive such a vote from a colored man on account of his race, color or previous condition of servitude, but the section under which the indictment was brought did not specifically confine the offense to a refusal for such a reason or to such discrimination, although in previous sections of the Act there was a general purpose disclosed in the Act to enforce the Fifteenth Amendment. The demurrer was sustained on the ground that the section was invalid.

Chief Justice Waite, in delivering the opinion of the Court, said, at p. 221:

"We are, therefore, directly called upon to decide whether a penal statute enacted by Congress, with its limited powers, which is in general language broad enough to cover wrongful acts without as well as within the constitutional jurisdiction, can be limited by judicial construction so as to make it operate only on that which Congress may rightfully prohibit and punish. For this purpose we must take these sections of the statute as they are. We are not able to reject a part which is unconstitutional, and retain the remainder, because it is not possible to separate that which is unconstitutional, if there be any such, from that which is not. The proposed effect is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not now there. Each of the sections must stand as a

whole or fall altogether. The language is plain. There is no room for construction,, unless it be as to the effect of the Constitution. The question then to be determined is whether we can introduce words of limitation into a , penal statute so as to make it specific, when, as expressed, it is general only. ·

" It would certainly be dangerous if the legislature could set a net large anough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of the government."

: And again the Chief Justice said: ' . ·

" To limit this statute in the manner now asked for would be to make a new law, not to enforce the old one. This is no part of our duty." -

. The same principle was laid down, and this language approved by this Court, in the *Trade Mark Cases,* 100 U. S. 82, in which, to save the validity of a general statute providing for trade marks, the Court was asked to construe the statute to apply only to trade marks in interstate commerce. It was held this could not be done. Mr. Justice, Miller, speaking for the Court, at p. 98, said:

" It has been suggested that if Congress has power to regulate trade-marks used in commerce with foreign nations and among the several States, these statutes shall be held valid in that class of cases, if no further. To this there are two objections: First, the indictments in these cases do not show that the trade-marks which are wrongfully used were trade-marks used in that kind of commerce. Secondly, while it may be true that when one part of a statute is valid and constitutional, and another part is unconstitutional and void, the court may enforce the valid part where they are distinctly separable so that each can stand alone, it is not within the judicial province to give to the words used by Congress a narrower meaning

than they are manifestly intended to bear in order that
crimes may be punished which are not described in lan-
guage that brings them within the constitutional power
of that body."

The case of *Butts* v. *Merchants and Miners Transporta-
tion Company,* 230 U. S. 126, concerned the application
of the Civil Rights Act of March 1, 1875, to vessels of
the United States engaged in the coastwise trade.   In the
*Civil Rights Cases,* 109 U. S. 3, it was held that the Civil
Rights Act of 1875, to protect all citizens in their civil and
legal rights, and in accordance with the terms of which a
defendant was indicted for denying the privileges and
accommodations of a theater in a State to a person on
account of her color, was unconstitutional because power
to enact and enforce such legislation in a State was in
the state legislature only.   The declaration in the *Butts
Case* was brought to recover penalties for violation of the
Act against a corporation engaged in the transportation of
passengers and freight between Boston, Mass., and Nor-
folk, Va., and the discrimination occurred on the high seas
and in the jurisdiction of the United States, and not within
any State.   It was contended that the Federal Civil
Rights Act could, therefore, apply in such a case.   The
Court pointed out the all-inclusive words of the Act of
Congress and held that they could not be cut down to
include only what was strictly within the federal jurisdic-
tion.   The Court said:

" Only by reason of the general words indicative of the
intended uniformity can it be said that there was a pur-
pose to embrace American vessels upon the high seas, the
District of Columbia and the Territories.   But how can
the manifest purpose to establish an uniform law for the
entire jurisdiction of the United States be converted into
a purpose to create a law for only a small fraction of that
jurisdiction?   How can the use of the general terms de-
noting an intention to enact a law which should be appli-

cable alike in all places within that jurisdiction be said to indicate a purpose to make a law which should be applicable to a minor part of that jurisdiction and inapplicable to the major part? Besides, it is not to be forgotten that the intended law is both penal and criminal." Citing the case of *United States* v. *Reese,* and the *Trade Mark Cases, supra,* as well as *United States* v. *Harris,* 106 U. S. 629, 642; *Baldwin* v. *Franks,* 120 U. S. 678, 685; *James* v. *Bowman,* 190 U. S. 127, 140; *United States* v. *Ju Toy,* 198 U. S. 253, 262; *Illinois Central Railroad Co.* v. *McKendree,* 203 U. S. 514, 529-530; *Karem* v. *United States,* 121 Fed. 250, 259.

The effect of the authorities we have quoted is clear to the point that we may not in a criminal statute reduce its generally inclusive terms so as to limit its application to only that class of cases which it was within the power of the legislature to enact, and thus save the statute from invalidity. What it is proposed to do here is much more radical, for it is to ignore and hold for naught a plain prohibition of the keeping of account books in Chinese and insert in the act an affirmative requirement that account books, not definitely determined which are adapted to the needs of the taxing officials, be kept in the permitted languages. This is quite beyond the judicial power.

The suggestion has been made in argument that we should accept the construction put upon a statute of the Philippine Islands by their Supreme Court, as we would the construction of a state court in passing upon the federal constitutionality of a state statute. The analogy is not complete. The Philippines are within the exclusive jurisdiction of the United States Government, with complete power of legislation in Congress over them; and when the interpretation of a Philippine statute comes before us for review, we may, if there be need therefor, re-examine it for ourselves as the court of last resort on

such a question. It is very true that, with respect to questions turning on questions of local law, or those properly affected by custom inherited from the centuries of Spanish control, we defer much to the judgment of the Philippine or Porto Rican courts. *Cami* v. *Central Victoria, Ltd.,* 268 U. S. 469; *Diaz* v. *Gonzales,* 261 U. S. 102. But on questions of statutory construction, as of the Philippine Code of Procedure adopted by the United States Philippine Commission, this Court may exercise an independent judgment. In *Philippine Sugar Co.* v. *Philippine Islands,* 247 U. S. 385, involving the effect of § 285 of that Code, this Court said, at p. 390:

" It is also urged that, since the construction of § 285 is a matter of purely local concern, we should not disturb the decision of the Supreme Court of the Philippine Islands. This court is always disposed to accept the construction which the highest court of a territory or possession has placed upon a local statute. *Phoenix Ry. Co.* v. *Landis,* 231 U. S. 578. But that disposition may not be yielded to, where the lower court has clearly erred. *Carrington* v. *United States,* 208 U. S. 1."

The question of applying American constitutional limitations to a Philippine or Porto Rican statute dealing with the rights of persons living under the government established by the United States, is not a local one, especially when the persons affected are subjects of another sovereignty with which the United States has made a treaty promising to make every effort to protect their rights. The fundamental law we administer in the Philippine bill of rights was a marked change from that which prevailed in the Islands before we took them over, and is to be enforced in the light of the construction by this Court of such limitations as it has recognized them since the foundation of our own government. In its application here, we must determine for ourselves the necessary meaning of a statute officially enacted in English, and its conformity with fundamental limitations.

We can not give any other meaning to the Bookkeeping Act than that which its plain language imports, making it a crime for any one in the Philippine Islands engaged in business to keep his account books in Chinese. This brings us to the question whether the law thus construed to mean what it says is invalid.

The Philippine Bill of Rights, already referred to, provides that:

" No law shall be enacted in said islands which shall deprive any person of life, liberty, or property without due process of law, or deny to any person therein the equal protection of the laws."

In *Serra* v. *Mortiga,* 204 U. S. 470, at 474, this Court said:

" It is settled that by virtue of the bill of rights enacted by Congress for the Philippine Islands, 32 Stat. 691, 692, that guarantees equivalent to the due process and equal protection of the law clause of the Fourteenth Amendment, the twice in jeopardy clause of the Fifth Amendment, and the substantial guarantees of the Sixth Amendment, exclusive of the right to trial by jury, were extended to the Philippine Islands. It is further settled that the guarantees which Congress has extended to the Philippine Islands are to be interpreted as meaning what the like provisions meant at the time when Congress made them applicable to the Philippine Islands. *Kepner* v. *United States,* 195 U. S. 100.

" For the purpose, therefore, of passing on the errors assigned we must test the correctness of the action of the court below by substantially the same criteria which we would apply to a case arising in the United States and controlled by the bill of rights expressed in the amendments to the Constitution of the United States."

In view of the history of the Islands and of the conditions there prevailing, we think the law to be invalid, because it deprives Chinese persons—situated as they are,

with their extensive and important business long established—of their liberty and property without due process of law, and denies them the equal protection of the laws.

Of course, the Philippine Government may make every reasonable requirement of its taxpayers to keep proper records of their business transactions in English, or Spanish, or Filipino dialect, by which an adequate measure of what is due from them in meeting the cost of government can be had. How detailed those records should be, we need not now discuss, for it is not before us. But we are clearly of opinion that it is not within the police power of the Philippine Legislature, because it would be oppressive and arbitrary, to prohibit all Chinese merchants from maintaining a set of books in the Chinese language, and in the Chinese characters, and thus prevent them from keeping advised of the status of their business and directing its conduct. As the petitioner Yu Cong Eng well said in his examination, the Chinese books of those merchants who know only Chinese and do not know English and Spanish, (and they constitute a very large majority of all of them in the Islands,) are their eyes in respect of their business. Without them, such merchants would be a prey to all kinds of fraud and without possibility of adopting any safe policy. It would greatly and disastrously curtail their liberty of action, and be oppressive and damaging in the preservation of their property. We agree with the Philippine Supreme Court in thinking that the statute, construed as we think it must be construed, is invalid.

In *Lawton* v. *Steele,* 152 U. S. 133, 137, the Court said:

" To justify the State in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive

upon individuals. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts."

In *Holden* v. *Hardy*, 169 U. S. 366, 398, the Court said:

" The question in each case is whether the legislature has adopted the statute in exercise of a reasonable discretion, or whether its action be a mere excuse for an unjust discrimination, or the oppression, or spoliation of a particular class."

In the case of *Meyer* v. *Nebraska,* 262 U. S. 390, this Court considered the validity of state legislation making it unlawful to teach a foreign language to children, adopted on the theory that the State had the right to protect children likely to become citizens from study of a particular language, in which they might read and learn doctrine inimical to the Constitution of the United States and to the Nation, and forbidding the teachers of the language from pursuing their occupation on this account, and held it invalid. The Court said:

" While this Court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men. . . . The established doctrine is that this liberty may not be interfered with under the guise of pro-

tecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the State to effect. Determination by the legislature of what constitutes proper exercise of police power is not final or conclusive but is subject to supervision by the courts."

The same principle is laid down in *Pierce* v. *Society of Sisters,* 268 U. S. 510, in *Truax* v. *Raich,* 239 U. S. 33, and in *Adams* v. *Tanner,* 244 U. S. 590, in which this Court has held legislative attempts arbitrarily and oppressively to interfere with the liberty of the individual in the pursuit of lawful occupations to involve a lack of due process.

In *Adams* v. *Tanner, supra,* an Act to restrict the maintenance of employment agencies, by forbidding the collection of fees from those seeking work, to avoid the extortion to which such workers were often subjected, was held unconstitutional. The Court said, at p. 594:

"Because abuses may, and probably do, grow up in connection with this business, is adequate reason for hedging it about by proper regulations. But this is not enough to justify destruction of one's right to follow a distinctly useful calling in an upright way. Certainly there is no profession, possibly no business, which does not offer peculiar opportunities for reprehensible practices; and as to every one of them, no doubt, some can be found quite ready earnestly to maintain that its suppression would be in the public interest. Skillfully directed agitation might also bring about apparent condemnation of any one of them by the public. Happily for all, the fundamental guaranties of the Constitution can not be freely submerged if and whenever some ostensible justification is advanced and the police power invoked."

In *Truax* v. *Raich, supra,* the people of the State of Arizona adopted an Act, entitled "An Act to protect the

citizens of the United States in their employment against non-citizens of the United States," and provided that an employer of more than five workers at any one time in that State should not employ less than eighty per cent. qualified electors or native born citizens, and that any employer who did so should be subject upon conviction to the payment of a fine and to imprisonment. It was held that such a law denied aliens an opportunity of earning a livelihood and deprived them of their liberty without due process of law, and denied them the equal protection of the laws. As against the Chinese merchants of the Philippines, we think the present law, which deprives them of something indispensable to the carrying on of their business, and is obviously intended chiefly to affect them as distinguished from the rest of the community, is a denial to them of the equal protection of the laws.

We hold the law in question to be invalid.

*Judgment reversed.*