**William E. KLOTZ, et ux., Plaintiffs,**

v.

**Robert W. UNDERWOOD, et ux., Defendants.**

**No. CIV-2-81-21.**

United States District Court, E.D. Tennessee, Northeastern Division.

Jan. 4, 1982.

On the Merits Feb. 11, 1982.

Michael A. Bragg, Bristol, Va., and Thomas M. Johnson, Bristol, Tenn., for plaintiffs.

Wendal Jackson and David W. Tipton, Bristol, Tenn., for defendants.

## ON MOTION TO DISMISS

NEESE, District Judge.

This is a civil action for damages as a result of alleged deceit in connection with the private sale of a residence. 28 U.S.C. § 1332(a)(1). The plaintiffs assert claims under the common-law tort of deceit and also under the provisions of the Tennessee Consumer Protection Act of 1977 (the Act), T.C.A. §§ 47–18–101 et seq. The defendants moved for a dismissal of such latter claim, ostensibly for the failure of the plaintiffs to state a claim upon which relief can be granted, Rule 12(b)(6), Federal Rules of Civil Procedure. Such motion lacks merit.

The thrust of the claim of the plaintiffs herein is that, in connection with the sale of a residence to them, the defendants intentionally concealed from them the fact that a portion of such residence had extensive structural-damage, which damage was hidden from the plaintiffs and could not have been discovered by them through the exercise of reasonable diligence. The defendants argue in support of their motion: that the Act does not apply either (a) to transactions in real estate, as opposed to those involving goods or services, or (b) to isolated transactions between individuals not engaged regularly in the business of making such trades or sales.

The Court's reading of the somewhat confusing Tennessee Act * is not convincing that either such contention is correct. In 3 separate places, the Act refers to real property. T.C.A. §§ 47–18–103(a), (h), 47–18–109(a). Thus, it would appear that the Act contemplates that its provisions cover transactions in real estate.

It is true that some 20 of the unfair or deceptive acts or practices listed in T.C.A. § 47–18–104(b) appear to be directed at the sale of goods or services, and not real estate. However, this would not seem to preclude the sale of real property from falling within the "catch-all" provisions of T.C.A. § 47–18–104(a) or § 47–18–104(b)(21). Subsection 104(b), supra, states that the acts or practices mentioned therein are not to limit the scope of subsection (a), supra. Had the Tennessee General Assembly desired to exclude transactions in real estate from the scope of the Act, they could easily have so provided in T.C.A. § 47–18–111, which lists certain exemptions from such Act.

Neither does the Court find any persuasive indication in the Act that it does not apply to isolated sales between individuals. Again, if the legislators had desired to so limit the Act, they easily could have provided; they did not appear to have any great difficulty in providing exemptions for the types of conduct which they felt should not fall within the scope of the Act. See idem.

Not being convinced that the Act could not apply to the transaction upon which this action is based, the motion of the defendants for a dismissal of such claim of the plaintiffs hereby is

DENIED.

## ON THE MERITS

Mr. and Mrs. William E. Klotz (buyers) purchased through a realtor from Mr. and Mrs. Robert W. Underwood (sellers) for $90,000 property improved by a rural dwelling and a barn on Reedy Creek road, near

---

* The Court, like counsel, is hampered by the lack of any published legislative history of such Act or any published decisions of the courts of Tennessee construing it.

Bristol in Sullivan County, Tennessee, on August 29, 1980. The sellers were moving their residence to Alabama; the buyers were moving theirs from New Jersey because of Mr. Klotz' transfer to this area.

The sellers vacated, and buyers occupied, such premises on October 21, 1980 prior to formal consummation of their sale-and-purchase of October 31, 1980. The initial portion of the dwelling was a century-old or considerably more; it was enlarged by additions 20 to 30 years before 1980; and a final enlargement was added 5 to 7 years ago. The end-result was a nice, unusual residence-property which the sellers had decorated in good-taste.

Mr. Klotz visited the premises briefly 3 times before the buyers moved in. The buyers voiced some objections and posed some questions concerning the property during negotiation, but all such matters were adjusted and none appertained to the current issues between the parties.

During these visits a cursory inspection was made of the dwelling by Mr. Klotz. He was not, to his knowledge, hindered in his inspections by anything either of the sellers did or failed to do. He wanted a professional engineering-inspection generally of the structure the buyers were purchasing, including its wiring and plumbing because the dealings of the parties were through a realtor.

However, he was unable within the confines of the time available to him to locate an expert and was told there was no person readily available who was competent to render an opinion in that regard. The buyers made no claim that the sellers hampered them in any way in obtaining the services of a structural engineer.

For nearly 2 months during the negotiation of the terms of a memorandum of the eventually-executed agreement of the parties,** Mr. Klotz was cognizant that it con-

tained a proposed clause, by which the buyers would accept the structures on the premises in their condition physically at the time of purchase-and-sale and understood that such memorandum constituted the only warranties or representations being made to the buyers by the sellers. Despite these agreements, the buyers contend that Mrs. Underwood represented orally to them that there were " * * * no problems with the house * * * " except, according to the recollection of 1 witness, for " * * * 1 light-switch that doesn't work. * * * "

The buyers soon discovered after their occupancy blisters on 3 areas on the exterior-walls of the oldest and next-oldest portions of their home. Mr. Klotz could not observe any other defect at those places, although he suspected leakage of water where the oldest and newest portions had been adjoined in the most recent remodeling.

The buyers brought in, with more expertise to diagnose the condition of their home, Mr. Scotty Nunn who could conclude no more than had Mr. Klotz until he removed a portion of one wall. Underneath he discovered progressively rotten members and appurtenances of the structure, which it cost the buyers $7,078.46 to repair.

Mr. Klotz discussed with a former architect, a former contractor, a former worker, Mr. Nunn, 3 neighbors and the neighborhood-grocer the unexpected expense he had thus incurred. He then consulted a lawyer who wrote a letter concerning this to the sellers. Thereafter, the buyers commenced this lawsuit; the sellers hired themselves a lawyer; and the latter counter-claimed the buyers.

I

■ In addition to claiming that the sellers had engaged in acts which were deceptive to them as also claimed in violation of

** It was agreed therein that: " * * * All electrical, plumbing, heating and cooling systems, and all appliances [were] to be in working order at the time of closing including [the] septic system. * * * Unless otherwise stated above, the [p]urchasers agree[d] to accept all improvements in their present physical condition. * * * The terms and conditions as set forth above represent[ed] the entire contract between the [p]urchaser and the [s]eller, any other terms or conditions, verbal or implied, notwithstanding. * * * "

the Tennessee Consumer Protection Act of 1977 (Act), *esp.,* T.C.A. §§ 47–18–104(a), (b)(21), *see* memorandum opinion and order of January 4, 1982 herein, the buyers asserted that Mrs. Underwood defrauded them in this transaction by concealment of hidden defects in the house and made misrepresentations to them of the absence of them, upon which they relied to their damage. There was insufficient evidence relative to either of these claims to have permitted the jurors to have found directly or by reasonable inferences for the buyers; (indeed, the Court could have decided such claims as a matter of law on the basis of the lack of disputed facts following the close of the buyers' evidence).

The nearest analogy to the claimed facts-at-issue herein, known to the Court now, was where, during negotiations for a sale-and-purchase of another dwelling in East Tennessee, the sellers told the buyers the latter "* * * would have all the water they wanted * * *" or "* * * could use all the water they wanted at the flat rate of $2.00 per month * * *," when the sellers knew the buyers could not have from the supplying-utility, or use, any water between 7:00 o'clock, p.m. each evening until the next 7:00 o'clock, a.m. The sellers testified that they did not share this knowledge they had with the buyers for fear of losing the sale.

By the exercise of ordinary diligence, there was no reasonable way the buyers, through common observation, could have discovered what the sellers admitted they knew, and the buyers did not know, about the limited water-use they were acquiring. *Simmons, et ux. v. Evans, et ux.* (1947), 185 Tenn. 282, 206 S.W.2d 295. Those buyers sought rescission judicially of their agreement with those sellers, on the ground of fraud and misrepresentation of a material fact; they were denied relief in the trial-court.

On appeal, however, the Supreme Court of Tennessee reversed that decision; it was of the opinion that in this situation *equity* required the sellers to perform their duty of disclosing the limitation-of-use of the required water unless " * * * common obser-

vation or such inquiry as the exercise of ordinary prudence required would have furnished such information. * * *" *Ibid.,* 185 Tenn. at 286–287(3), 206 S.W.2d 295. That action is clearly distinguishable from this one because of their dissimilar facts.

Furthermore, if the buyers had proved their case, they had an adequate remedy at law herein. Where there is an adequate remedy at law, it is inappropriate for this Court to exercise its equitable powers. *Moore v. Sims* (1976), 442 U.S. 415, 424–425, 99 S.Ct. 2371, 2377–2378, 60 L.Ed.2d 994, 1004[4].

A similar duty on the sellers here would have attached only *had* it been shown that one or both of them had knowledge of the existence of hidden defects in their structure, caused by the ravages of time and weather, and, after and in the event of such showing, that an inspection by the buyers would not have revealed to them the same information known to the sellers. The failure to disclose latent defects in a structure is not fraudulent where the seller has no knowledge of them and, consequently, no duty to make any disclosure. *Edwards v. Travelers Insur. of Hartford, Conn.,* C.A. 6th (1977), 563 F.2d 105, 114–115[8] (stating such as the law of Tennessee).

It was not shown by the evidence of the buyers that any confidential or fiduciary relationship was extant between these buyers and sellers at the pertinent times; therefore, there also being no evidence of a dangerous condition in the structure, as opposed to mere economic loss, it was for the buyers who bought the property as above, *supra,* to "beware" in purchasing through a realtor this land and these structures of ancient vintage. *Smith v. Tucker* (1925), 151 Tenn. 347, 360(1), 270 S.W. 66. ("The rule of *caveat emptor* generally applies to sales of land.")

As to the aforementioned statutory claim of deception by the sellers, there was a paucity of evidence that either of them did or failed to do anything which deceived the buyers. It was shown that Mrs. Under-

wood knew of defects in the dwelling and knew that all of them which were observable by an expert in 1977 had then been repaired. She had a logical, undeceitful reason to think 3 years afterward that there were "no problems with the house" (excusing an inoperative electric-switch). The buyers had no pre-sale-and-purchase contact at all with Mr. Underwood.

## II

The sellers offered no additional evidence on their counterclaim. When they had such an opportunity, there was insufficient evidence then before the jurors to have supported their finding directly or by reasonable inferences that the buyers had acted frivolously and without legal or factual merit or had brought this suit for the purpose of harassing the sellers. Such was essential under T.C.A. § 47–18–111(e), their only remaining claim.

The General Assembly of Tennessee omitted to define the terms: frivolously and without legal or factual merit, or suit brought [by the person instituting the action] for the purpose of harassment, in the Act, *supra.* So we must allude to their general meaning in similar contexts:

" * * * [A]ccording to Webster's Unabridged Dictionary, 'frivolous' means 'of little weight or importance, not worth notice, slight.' * * * " .*United States v. Esters,* D.C.Ark. (1961), 161 F.Supp. 203, 206[2] (on whether an appeal was taken frivolously); *accord* (citing the immediately-foregoing authority): *United States v. Piper,* D.C.Tex. (1964), 227 F.Supp. 735, 740[16] (on bail when an appeal was taken frivolously). Frivolity is implied if the lack of merit is apparent from a mere glance at the record. *Crook v. Crook,* C.A.Cal. (1960), 7 Cal.Rptr. 892, 896, 184 Cal.App.2d 745; to the *same* effect: *Tomasello v. Trump,* 30 Misc.2d 643, 217 N.Y.S. 304, 308 ("frivolous" when so clearly insufficient on its face and so clearly and palpably without merit that argument is unnecessary to convince the court thereof).

As jurisdiction herein rests upon the diverse citizenships of the contending parties and the matter in controversy, 28 U.S.C. § 1332(a)(1), the decisions herein are to be determined by the laws of Tennessee. 28 U.S.C. § 1652. In the matter of an appeal from a decree awarding workers' compensation, the Supreme Court of Tennessee found the appeal was "frivolous" and awarded the opposing party considerable damages, T.C.A. § 27–1–122, on that account. *Lambert v. Travelers Insurance Company* (Tenn., 1981), 626 S.W.2d 265 (1981) (the appealing party "cited no evidence or rule of law which even tends to entitle it to a reversal or to other relief from the decree" and during the pendency of the appeal had paid the award as and in the amount decreed "thereby recognizing the validity and correctness of the * * * " decree).

The buyers' shortcoming here did not extend to both the evidence and the law, but only to the paucity of their evidence. Weak cases were presented by both the buyers in their original claim and the sellers in their counterclaim, but " * * * there is a vast difference between a weak case, even a very weak one, and a frivolous one. * * * " *Dillingham v. Wainwright,* D.C.Fla. (1976), 422 F.Supp. 259, 261[2] (discussing an application for a federal writ of habeas corpus). " * * * [A] court should [not] readily assume frivolity * * *. To the contrary, it is incumbent upon the court to develop the case and to sift the claims and known facts thoroughly until completely satisfied either of its merit or lack of same. * * * " *Jones v. Bales,* D.C.Ga. (1972), 58 F.R.D. 453, 464[25], affirmed (on supplemental opinion of lower-court) C.A. 5th (1973), 480 F.2d 805 (complaint of convicted felon for damages for deprivation of civil rights).

Only after the testimony of Mr. Klotz, was this Court convinced that the buyers' claim under the evidence was clearly and palpably without merit. A mere glance at the record did not suffice so to do, and the Court did more than glance in the earlier effort to divine the legislative intention in passing the Act, *see* earlier memorandum opinion and order herein, *supra.*

The alternative purpose of harassment is not defined by the Act; neither has the Supreme Court availed itself of the opportunity, or found it necessary to define it, on many occasions when dealing with the term. *Cameron v. Johnson* (1968), 390 U.S. 611, 619–621, 88 S.Ct. 1335, 1339–1340, 20 L.Ed.2d 182, 189–190[8], cited in *Younger v. Harris* (1971), 401 U.S. 37, 54, 91 S.Ct. 746, 755, 27 L.Ed.2d 669, 682 (separate concurring and dissenting opinion of Justice Brennan, with whom Justices White and Marshall joined); which was cited in *Mitchum v. Foster* (1972), 407 U.S. 225, 239, 92 S.Ct. 2151, 2160, 32 L.Ed.2d 705, 711[5]; also cited in *Kugler v. Helfant* (1975), 421 U.S. 117, 124, 95 S.Ct. 1524, 1530, 44 L.Ed.2d 15, 24[2]; also cited in *Ellis v. Dyson* (1975), 421 U.S. 426, 430, 95 S.Ct. 1691, 1694, 44 L.Ed.2d 274, 281[1a]; also cited in *Colorado River Water Const. Dist. v. U.S.* (1976), 424 U.S. 800, 816, 96 S.Ct. 1236, 1245, 47 L.Ed.2d 483, 497[18a], and *United States v. LaSalle National Bank* (1974), 437 U.S. 298, 313, 98 S.Ct. 2357, 2366, 57 L.Ed.2d 221, 234[7], which cited *United States v. Powell* (1964), 379 U.S. 48, 58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112, 120[4].

There was no definition in the same context in *Shaw v. Garrison,* C.A. 5th (1972), 467 F.2d 113, 122[4], certiorari denied (1972), 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317.

A lower court *held* "bad faith" *and* "harassment" by state prosecuting officials, within the rule permitting federal intervention in a state prosecution, connote intentional, purposeful conduct motivated by their malicious or discriminatory purpose, *Maney v. Ratcliff,* D.C.Wis. (1975), 399 F.Supp. 760, 772[14], and that definition of these 2 terms was adopted in *Kelly v. Gilbert,* D.C.Mont. (1976), 437 F.Supp. 201, 222[20]. Acts constituting harassment in civil-rights litigation were described in *Thomas v. Southdown Sugars, Inc.,* D.C.La. (1980), 484 F.Supp. 1317, 1320[2].

The fact that the Supreme Court, on 8 or more occasions over a period extending to 12 years, has not paused to give the term, harassment, in statutes a legal definition indicates to this Court that the term should not be considered so vague that persons of common intelligence must disagree as to its meaning and differ as to its application. *Yu Cong Eng v. Trinidad* (1926), 271 U.S. 500, 518, 46 S.Ct. 619, 623, 70 L.Ed. 1059, 1067 (headnote 3), citing *Connally v. General Construction Co.* (1926), 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (headnote 2). Commonly-intelligent persons would understand that "harassment [means] * * * the act of harassing: VEXATION, ANNOYANCE * * *." *See* Webster's Third New International Dictionary of the English Language (unabridged, 1961), at 1031.

The Court remembers not one word from Mr. Klotz to indicate that either seller harassed, vexed, or annoyed him or his wife. As stated, *supra,* only this litigation brought either of them in contact personally with Mr. Underwood.

At the close of the evidence of the buyers, the Court directed properly a verdict for the sellers. When all the evidence was closed, the Court directed properly a verdict for the buyers.

Each should be taxed by the clerk with their own costs.