STATE OF IOWA, Appellee, v. WILLIAM SENTNER, Appellant.

No. 45227.

592

June 17, 1941.

Fred Everett, Attorney General, John M. Rankin, succeeding Attorney General, Jens Grothe, Assistant Attorney General, and Luther M. Carr, County Attorney, for appellee.

John Connolly, Jr., C. I. McNutt, and George O'Malley, for appellant.

Bliss, J.—On July 6, 1938, the grand jury of Jasper County, Iowa, by indictment charged that the defendant and Hollis Hall, on or about June 23, 1938, did "jointly and several-

ly, by word of mouth, advocate and teach the duty, necessity and propriety of crime, sabotage, violence, and other unlawful methods of terrorism as a means of accomplishing industrial and political reform (and did, then and there, openly, wilfully and deliberately justify by word of mouth the commission and attempt to commit crime, sabotage, violence, and other unlawful methods of terrorism to exemplify, spread and advocate the propriety of the doctrines of syndicalism,) as defined in sections 12906 and 12907 of the 1935 Code of Iowa * * *.''

The defendant, a resident of St. Louis, Missouri, was, at all times pertinent, International Vice President of the United Electrical, Radio and Machine Workers of America, and Hollis Hall was the Vice President of Local No. 1116 of that Union,. at Newton. Separate trials were granted the accused, and later the charge was dismissed as to Hall.

On motion of the defendant made at the close of the main case of the state, the court withdrew all that part of the charge included above in the parenthesis. Some items of testimony, if admissible at all, may have had some pertinency to the part withdrawn, but the testimony was not withdrawn.

The statutes of Iowa define criminal syndicalism in these words: ''Criminal syndicalism is the doctrine which advocates crime, sabotage, violence, or other unlawful methods of terrorism as a means of accomplishing industrial or political reform.'' (1935, 1939 Code section 12906. Chapter 382, section 1, Acts of the 38th General Assembly, 1919.)

Code section 12907, enacted at the same time, specifies four ways or means of committing this crime; to wit:

''Any person who:

''1. By word of mouth or writing, advocates or teaches the duty, necessity, or propriety of crime, sabotage, violence, or other unlawful methods of terrorism as a means of accomplishing industrial or political reform; or

''2. Prints, publishes, edits, issues, or knowingly circulates, sells, distributes, or publicly displays any book, paper, document, or written matter in any form, containing or advocating, advising, or teaching the doctrine that industrial or political re-

form should be brought about by crime, sabotage, violence, or other unlawful methods of terrorism; or

"3. Openly, willfully and deliberately justifies, by word of mouth or writing, the commission or the attempt to commit crime, sabotage, violence, or other unlawful methods of terrorism with intent to exemplify, spread, or advocate the propriety of the doctrines of criminal syndicalism; or

"4. Organizes or helps to organize, or becomes a member of or voluntarily assembles with any society, group, or assemblage of persons formed to teach or advocate the doctrines of criminal syndicalism—is guilty of a felony and punishable by imprisonment in the state penitentiary or reformatory for not more than ten years, or by a fine of not more than five thousand dollars, or both."

Section 12908 provides that whenever two or more persons assemble for the purpose of advocating or teaching the doctrines of criminal syndicalism, as above outlined, such an assemblage is unlawful and every person participating therein by his aid or instigation is guilty of a felony and may be punished as above stated.

These sections are, and have always been, in the chapter in the Code covering "Treason And Offenses Against The Government."

It is to be noted that the crime is the (1) advising, advocating, or teaching of the prohibited doctrine, or (2) justifying the commission or attempt to commit crime, etc., for the same purpose, all by word of mouth, or by any form of writing, printing, display, etc., or (3) organizing, helping to organize or being a member of, any group, formed for the same purpose, or (4) (section 12908) assembling for that purpose. In (1) the overt act, which is the crime, or the corpus of the crime, is the "advising, etc.," in the manner stated. In (2), it is the "justifying" of the matters stated. In (3), it is the "organizing, etc.," or "being a member, etc.," of the described organization. In (4), it is the "assembling" for the prohibited purpose. In other words, the crime is committed, when any of the abovementioned "overt acts" is done. Commission of, or participation in the "crime, violence, sabotage, or other unlawful methods of

terrorism," is not the offense covered by the statute, or an essential element thereof.

. In the case before us, the indictment limits the means or methods to "word of mouth." The purpose, as stated in the indictment, "is accomplishing industrial *and* political reform." The court instructed that the state was required to establish the overt act as a means of accomplishing "industrial *or political reform*," although there is no evidence in the record supporting any act, purpose, or intention on the part of the defendant to accomplish political reform.

The indictment and prosecution arose from a labor dispute between the Maytag Company, as employer, and the employees of that company, among whom were members of the Union, Local No. 1116. In 1937 a contract, covering wage and other labor conditions, had been entered into by the company and the United Electrical, Radio and Machine Workers of America, covering the period beginning May 1, 1937, and terminating May 1, 1938. The defendant had had some part in this, and in April, 1938, he came to Newton to take part in a conference looking to a renewal of the contract, or the making of a new one. In that month, the workmen of the company, at an election, held under the guidance of the Federal Government, through the National Labor Relations Board selected the Union, of which the defendant was Vice President, by a vote of 1180 to 247, as the bargaining agent of the employees for the year. A Negotiating Committee was appointed by the employees, and a similar committee was named by the company to work out a labor contract. The defendant, and officers of the Local Union and its attorney were on the first-mentioned committee, and the company officers and its Chicago attorney comprised the company committee. Several meetings of the two committees were had in April and May, 1938, one of them being in Chicago, but no contract was agreed upon. During the conferences, it was stated by the company committee that a 10-percent wage cut was going to be put into effect. On May 7, 1938, the defendant made a speech on the north side of the public square in the city, in behalf of the employees in which he stated that the men were not properly paid in the light of the money the company had made in the past, and called upon

the citizens of Newton and its civic organizations to help the men in getting a settlement. He returned to St. Louis that evening. On the morning of May 9, 1938, when the employees came to work, the announcement of the 10-percent wage cut was posted on the bulletin board, effective that morning. Mr. Taylor, the President of the company, told Mr. Allison, the President of the Local, and Mr. Steinberger, the chief steward, that if the cut was not accepted he would fire every man, and later on being told that the cut would not be accepted, he told the men to leave the plant. They left about 10:30 o'clock in the forenoon, and a little later picket lines were formed. One at the street approaching the north gate of the plant and office building, and the other at the south gate. Mr. Taylor guessed that the most he saw in the picket lines that afternoon were 25 or 50 men at each place. The stewards of the local Union were organized into a council to take charge of the strike. The defendant was at St. Louis and Steinberger, the chief steward of the Local, telephoned him on May 9th and informed him what had taken place, and requested him to return to Newton when he could get in communication with the company. In the telephone conversation, the defendant advised the stewards' council that the picket lines should be conducted peacefully, and that no drunkenness or violence should be tolerated, and that the officers and stewards should continue negotiations with the company management. The picketing was maintained until about June 23, 1938, during which time, except for about two days, the plant was closed, and the foremen and employees, with the exception of watchmen, were not permitted therein. The defendant returned to Newton on May 11th, and, with the exception of week ends and a few other absences, remained there. Because of the defendant's public invitation on May 7th to the churches and civic organizations for aid in settling the labor controversy, Dr. Logan, pastor of the Methodist Church, invited the defendant and Union officials to his home for a conference. They accepted and a conference lasting an hour or more was had about May 18th. The defendant expressed his desire to settle the wage differences peaceably and without violence. During the forepart of June, some of the non-union employees formed what is designated in the record a "back-

to-work'' movement, at the reduced wage rate. A number of them in their own behalf, and as representatives of their asso-ciates and ''for the purpose of maintaining peace and quiet, law and order, in the city of Newton, and for the benefit of the general public,'' filed a petition in court, against the Union and its officers, and the defendant, asking for a writ of injunction against the defendants. The County Attorney, privately, and not in his official capacity, appeared for them. On June 10, 1938, Judge Bechly granted an order or decree, as prayed, for the issuance of a temporary injunction ''to restrain and enjoin the defendants, * * * their representatives, agents, friends, attorneys, servants, officers and pickets from interfering with the plaintiffs, or any of them, or anyone in league with them, by the use of violence, threats, intimidation, picketing, following and the like, either near the plaintiffs' homes, their respective persons, or the headquarters of the 'back-to-work' movement * * *, or at any and all other places, with the efforts of the plaintiffs, or any of them, or any one working with them, to organize a 'Back to Work' movement, or to secure pledges of the willingness on the part of the employees of the Maytag Company to return to work immediately without a contract negotiated by Committee for Industrial Organization, and the defendants * * * are further enjoined from using any insulting, loud, or foul language, and from booing or using opprobrious epithets, and from threatening plaintiffs, * * * or any one whom they solicit, or any other employee of the Maytag Company, whether solicited or not, and said defendants and each of them are hereby further restrained from advocating by word of mouth, or by any written or printed communication the use of violence, sabotage, or intimidation, or coercion, for the purpose of restraining or interfering with the plaintiffs, or any of them in their efforts to enlist men in the 'Back to Work' movement. It is further ordered that the defendants named herein, or any one in their behalf, are not enjoined from appealing singly to the plaintiffs, or to any employe of the Maytag Company by peaceful persuasion or attempting to educate them away from the 'Back to Work' movement, by any peaceable means, so long as the means used are not abusive or threatening, and the de-

fendants shall not approach any Maytag Company employe for such purpose, together, but singly and shall not in their single efforts at communication or persuasion, obstruct an unwilling listener by importunate following or dogging his footsteps. * * * ''

The defendant was away from Newton for some time between the Logan conference and June 16th. On the latter date, he made a speech in the vicinity of the Maytag plant in which he mentioned the injunction set out above. A number of witnesses for the state testified to having listened for short periods while the defendant was talking. They did not all hear the same things, and remembered but little of it, but the following is a composite of all that was testified to by all of the witnesses for the state, to wit: The judge who wrote that decision must have been asleep. It is not worth the paper it is written upon. He would prove it. Injunction or no injunction, we are not going to let anybody come in there and take our jobs. He waved a piece of paper in his hand to the crowd, and said the judge did not know what he was doing when he issued that injunction. He was trying to get the men to picket the fellows that wanted to go back to work. That he desired to test the validity of the injunction in court, and that if some of the men were put in jail the rest of them would contest it and put up bonds for them. He told the men to stick together.

The foregoing is all that the defendant said about the injunction of June 10th. As may be observed from the writ, it was directed only to unlawful and improper interference on the part of the defendants against the plaintiffs in securing recruits to the back-to-work movement. It was not directed at the defendants in their picketing of the plant, or in their interference with its operation by the company. So far as the record shows, this injunction was never violated by the defendant or by anyone against whom it was directed.

The defendant denied that he said the judge must have been asleep, and that the injunction was not worth the paper it was written on, but stated that he said every legal step possible would be taken to knock out the injunction; that he had never read it and did not wave it in his hand, and that it was not served on him, and that he understood it prevented union men

from approaching non-union men and requesting them to join the Union, or having any conversation whatsoever, and that in his opinion it was in violation of the Federal Statute, and the National Labor Relations Statute, and that Judge Bechly would not have issued the order if he was aware of such law.

On June 22, 1938, on petition of the Maytag Company against the local Union, its officers, members, agents, representatives, and attorneys (except John Connolly, Jr.), but not including this defendant, an order for a temporary injunction was issued by Judge Bechly restraining them from unlawfully interfering with plaintiff's control of its property, its employees, customers, etc., and from picketing in greater numbers than three at each of the entrances.

On June 15, 1938, President Taylor of the company and about 30 of the salaried personnel marched in a body to the north or office entrance of the plant and attempted to enter the plant. A number of pickets stepped in front of them and blocked their passage and pushed them back. Mr. Taylor and one or two others were pushed to the ground but no one was injured in any way. The defendant was not in Newton at this time. On June 16th Taylor rode up near the front entrance in his car while the defendant was making a speech down near the middle of the block. A number of people surrounded his car and someone told him he couldn't go in. Early in the strike the Union organized a group of patrols from its members to police the streets and grounds adjacent to the plant, to prevent disturbances, excessive drinking, and destruction of property. They visited the taverns and cautioned the men about drinking, and patrolled the plant every hour. The Mayor authorized some of these men to act as special peace officers of the city, which they did for a few days.

The plant was open for work on or about the 21st and 22d of June, and it was quite generally understood that it would be open for work on June 23d. On the evening previous, the defendant and William Allison, President of Local 1116, called upon Governor Kraschel at Des Moines to have him arrange for arbitration of the controversy. After calling upon the attorney for the Union, they returned to Newton about midnight and

retired. Quite a large number, including strikers and others intending to work, gathered at the plant early on the morning of June 23d. Some of the strikers had apparently arrived first and had possession of the plant and had locked and barricaded some of the doors, including doors inside the plant. Just how many were strikers or union men is not disclosed. Many foremen and non-union men entered and remained until it became evident that work was not to be resumed. Two or three non-union men were taken to the door and put out. A number of the men carried a light slat about a yard long, and used in making crates, in their hands. No use was made of these and no one was struck or misused. Some of the foremen were told that they might come and go as they pleased, according to their own testimony. A number of the men were named to police the plant, grounds, and adjacent streets, to keep order, and protect the property. Smoking was forbidden in certain rooms because of the material in them. The floors were kept clean, and the machinery was cleaned. Some of the doors were barred by placing castings against them. In so doing, one door was broken at the bottom.

The defendant testified that he was called from his bed at the hotel about 5:00 or 6:00 o'clock that morning and was told that he had better go to the plant. He went down to the Washer City Cafe on a corner diagonal from a corner of the plant near the south entrance. He testified before the Military Commission that although he had heard that some of the men had thought it would be the best thing to take possession of the plant, that he did not know that they had planned to until he heard it at the Union Hall about 8:00 o'clock that morning. He talked to many men that morning when he was on the cafe corner, but said that he never advised anyone to go into or to not go into the plant. Many witnesses testified for the State that they saw him talking to men that morning, and some of the men went toward the south gate, and some went away and some remained where they were. No one testified to hearing him say anything to anyone about going into the plant. One witness testified that he saw him motion to some men to come on. During the nine days the men were in the plant, he was seen occasionally in that locality, and

sometimes he talked to men looking from the windows. He stated that he had told the women to make coffee for the men. At his examination before the Military Commission, and in the contempt hearing, he testified that he had advised the men about the strike, and that as the head officer of the Union he was perhaps responsible for their conduct, even though he did not agree with things that were done, and that sometimes they took his advice and at other times they did not. Two witnesses testified that on the morning of June 23d, while he was at the cafe corner, they heard him say that personally he thought the men were justified in going into the plant.

We have set out everything material that any witness testified to hearing him say, or that he admitted saying, excepting certain testimony of the defendant at the contempt and military hearings, to which we will refer later. Even including the testimony at these hearings, there is no direct testimony in the record that the defendant by word of mouth ever by definite expression advocated or taught the duty, necessity and propriety of crime, sabotage, violence, or other unlawful methods of terrorism to accomplish industrial reform.

On July 1, 1938, the defendant and Mr. Allison went into the plant after Governor Kraschel requested that the men come out of the plant on the proposal that an effort would be made to arbitrate the dispute. At 8:45 o'clock that evening, the men left the plant and paraded to the Union Hall. There is testimony that the defendant was in the parade. Some time later, he made a public talk outside of the Hall. While the parade was passing Dr. Logan's church, someone threw a crudely lettered carton poster into the door of the church, on one side of which was printed ''C. I. O. Is On Top'' and on the other, ''This Is No Place For Scabs.'' There is not the slightest evidence as to who did this, or that the defendant had any connection with it.

On July 6, 1938, the indictment was returned. On July 13th the hearing on defendant's contempt proceedings, with respect to the injunction of June 22d, was begun. At the request of Judge Fuller, the Sheriff and the Mayor, martial law was declared in the city of Newton by the Governor, and on July 20th the National Guard took charge. Shortly thereafter the

defèndant testified in proceedings before a Military Commission.

The appellant has assigned 31 errors but we do not find it necessary to pass upon all of them.

■ I. He complains of the giving of Instruction 10 which was as follows:

"Sabotage is a malicious injury to or destruction of the property of an employer intentionally done by employees, during labor troubles, or in a controversy between the employer and employees. It includes two elements, malice and injury to the property of an employer.

"If during the labor controversy with their employer employees cut telephone wires, in or into the place of employment, or if they break tools, implements, or machinery of the employer kept in or about the plant where employed, or break a door or doors in the factory, or if they injure or destroy materials on hand for use in manufacturing or shipping the products of the plant, these things or any of them, if maliciously done would constitute sabotage."

His exception is well taken for the reason that there is no evidence whatsoever that the defendant ever advocated, taught, advised, urged, or instigated the members of his Union, or anyone, by word of mouth, or in any other manner, to sabotage the property of the Maytag Company, as contemplated by the statutes against criminal syndicalism, or to accomplish industrial reform. If it can be said that he urged the men to take possession of the property in a sit-down strike, such advice or direction cannot reasonably be construed into advice or direction to maliciously injure or destroy the property of their employer, as defined in the instruction. Having no direct proof of such advocacy or teaching by word of mouth on the part of the defendant, the state sought to prove it inferentially, by proof of the commission of sabotage by the strikers. Such evidence might be admissible were there other separate and independent evidence of such advocacy, but there is no such evidence, nor evidence even tending to prove it. The only testimony on the matter of sabotage is that of Taylor, President of the company. He testified that after the men left the plant on July 1st: "I

made an inspection of the plant and building at that time and found some little damage, telephone wires cut, one door broken. The machinery had started to rust, the bright parts. We found some material out of place, several packages of castings completely out of their place, found the sledge hammer ,and axe out of their accustomed place and dry lumber that had been whittled into clubs." The door was apparently injured when castings were placed against it. In mentioning the "breaking of tools, implements, machinery and doors," the court went quite beyond the evidence. The giving of the instruction was prejudicial error.

II. Error is assigned because the State as a part of its main case introduced some of the testimony of defendant given in the proceedings before the Military Commission, sometime in the latter part of July, 1938, or later. This testimony was read by question and answer from a transcript of those proceedings by the reporters who took the notes. Defendant had been examined at length before the Commission as to his being a member of the Communist Party, his official connections with the Party, his belief in the philosophies of Communism and Socialism with respect to industrial production, capital, labor, etc. He had expressed his belief in the soundness of these philosophies. Proper objections were made to the admissibility of this testimony because of its incompetency, immateriality and irrelevancy, and to the purpose on the part of the state to improperly inject these matters into the record solely to prejudice the jury against the defendant. Inquiries were made as to his connection with the activities of the strikers. The fact that the defendant was or had been a member of the Communist Party, and had been a party committeeman in Missouri, and believed in the philosophy and policies of that Party, were wholly immaterial, incompetent and irrelevant, with respect to the criminal charge for which he was being tried. Under the record here made, he was guilty of no crime in being or having been a member of the Communist Party, or in having official connection with that Party, or in believing in its political or economic theories. In stating these matters to the Military Commission, he was not guilty of criminal syndicalism. In express-

ing his views, he was exercising the right of free speech, one of the liberties preserved to him by the due process clause of the 14th Amendment of the United States Constitution, and by the Constitution of the State of Iowa. This he was entitled to do, so long as he did not abuse the right. He had the right to believe this philosophy, and to give expression to it and to teach it and seek converts to it, unless forbidden by law, so long as the means and methods used were peaceable and lawful, and no appeal was advocated or action taken to enforce or make effective such theory by violence or unlawful acts. The fundamental basis for this right is well expressed in the concurring opinion of Justice Brandeis, joined in by Justice Holmes, in Whitney v. People of California, 274 U. S. 357, 374, 47 S. Ct. 641, 648, 71 L. Ed. 1095, 1105, a criminal syndicalism case, in these words:

"To reach sound conclusions on these matters, we must bear in mind why a state is, ordinarily, denied the power to prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believe to be false and fraught with evil consequence. Those who won our independence believed that the final end of the state was to make men free to develop their faculties; and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty. They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew * * * that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good

ones.   Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form.   Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed. Fear of serious injury cannot alone justify suppression of free speech and assembly.   Men feared witches and burned women. It is the function of speech to free men from the bondage of irrational fears.''

The entire opinion of the eminent Justice is a classic upon the questions discussed.

The same thought was well expressed by Milton.   Blind though he was, he had a clear insight in all things affecting human rights.   Of limiting free speech, he said: ''And though all the winds of doctrine were let loose to play upon the earth, so Truth be in the field, we do injuriously, by licensing and prohibiting, to misdoubt her strength.   Let her and falsehood grapple.   Whoever knew Truth put to the worse in a free and open encounter?''   Justice Holmes in his dissenting opinion in Abrams v. United States, 250 U. S. 616, 630, 40 S. Ct. 17, 22, 63 L. Ed. 1173, 1180, with his usual clarity of thought and expression, said:

''But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas,—that the best test of truth is the power of the thought to get itself accepted in the competition of the market; and that truth is the only ground upon which their wishes safely can be carried out.   That, at any rate, is the theory of our Constitution.   It is an experiment, as all life is an experiment.   Every year, if not every day, we have to wager our salvation upon some prophecy based upon imperfect knowledge.   While that experiment is part of our system I think that we should be eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death, unless they so imminently threaten immediate interference with the lawful and

pressing purposes of the law that an immediate check is required to save the country."

Charles A. Beard in his work "The Great American Tradition," quotes from a letter of Thomas Jefferson to Elijah Boardman, of July 3, 1801: "We have nothing to fear from the demoralizing reasonings of some, if others are left free to demonstrate their errors and especially when the law stands ready to punish the first criminal act produced by the false reasonings; * * *."

The very question was lately answered by the United States Supreme Court in an opinion by Chief Justice Hughes, in De Jonge v. State of Oregon, 299 U. S. 353, 57 S. Ct. 255, 81 L. Ed. 278, wherein the defendant was prosecuted under a criminal syndicalism statute, prohibiting the use of crime, etc. " in accomplishing or effecting industrial or political *change or revolution*," by conducting a meeting held under the auspices of the Communist Party, which party it was alleged advocated criminal syndicalism, although no such doctrine was advocated at the meeting. The supreme court reversed the conviction. So in this case there was nothing which the defendant said in the hearing before the Military Commission, nor in the contempt hearing, which could be construed as advocating the doctrines of criminal syndicalism. Neither is there any evidence in the record that the Communist Party advocates such doctrines. If it did, an indictment might have been returned under paragraph 4 of section 12907, but this was not done. Defendant was indicted for advocating the doctrines by word of mouth, and the fact that he may have been a member of the Communist Party in no way tended to sustain the indictment. But the admission of this testimony, and like testimony of a more prejudicial type at the contempt hearing, and in the cross-examination of defendant as a witness in this case, was very prejudicial to him and militated against his having a fair trial, particularly in view of the vigorous manner in which the Communistic phase of the case was stressed by the County Attorney in his argument to the jury. For a case quite similar in its facts, and directly in point see People v. Immonen, 271 Mich. 384, 402, 261 N. W. 59, 66, a prose-

cution for displaying a red flag contrary to statute. The State showed that the defendants were members of the Communist Party, leaders therein and speakers at meetings of the Party, and one of them had been a candidate for probate judge on the ticket of that Party. In reversing a judgment for conviction, the court said: ''Clearly the guilt or innocence of each of these defendants turned upon the simple and sole issue of whether he committed the statutory offense; and the statutory offense is the 'display (of) a red flag in any public assembly * * *.' Nothing else. The testimony admitted as a part of the people's direct case just above noted was of such a character as to prejudice the jury against each of the defendants * * * in that the defendants were thereby deprived of a fair and impartial trial. This necessitates reversal.''

The error in this case likewise necessitates a reversal.

III. When the reporter, Thompson, was testifying to the matters referred to in division II hereof, the defendant developed on cross-examination something of the nature of the proceedings before the Military Commission, or Court. We may assume that this Commission was functioning under the provisions of Chapter 28.1 of Title III of the Iowa Code, and particularly sections 467.28 et seq. It appears without dispute that the city of Newton was under Martial Law by proclamation of the Governor, and that the reporters were employed by the Commission. The proceedings were not public, but were secret. One reporter testified: ''The reporting I did for the Iowa National Guards was by authority of the Military Commission and I reported it under the conditions that the transcript was to be turned over to the Military Commission and the proceedings to be kept a secret.'' There was an armed guard in the courtroom at all times. The witness could not recollect whether there was a guard over the defendant or not. The other reporter testified: ''I am testifying from a copy of the transcript I made. I was ordered to turn my transcript over to the Commission and I kept a copy and did not furnish a copy to anybody else.'' However, a copy made by each reporter was available to the state in this prosecution. Just how the defendant was procured to testify does not appear. He had no counsel or legal adviser representing him. It does not appear that he was advised of his rights

respecting the use against him of anything he might say. We do not mean to say or imply that because he had no counsel and was not advised as to his rights, standing alone, made the statements involuntary, but we mention them as factors to be considered. It clearly appears from the record that the testimony of the defendant was not voluntary but was compulsory, and that he so understood. The reporter was asked: "Was he told that he must answer the questions or words to that effect? A. *Well inferentially, I would say, yes, sir.*"

The State contends that since the second reporter did not hear any threats or promises made by any member of the Commission, his testimony was voluntary. What the defendant testified to was not a confession of the crime charged, nor does he so claim. What he contends is that the statements which he made at the hearing were not voluntary but were made because he was under compulsion, and that the State in attempting to use those statements against him in this prosecution violated his constitutional and statutory right not to be compelled to be sworn and to give testimony against himself, or which tends to criminate him. Fifth and Fourteenth Amendments to the United States Constitution; Section 10, Article I of the Constitution of Iowa; 1935 Code, section 11267; State v. Meyer, 181 Iowa 440, 164 N. W. 794; Doyle v. Willcockson, 184 Iowa 757, 169 N. W. 241; State v. Height, 117 Iowa 650, 91 N. W. 935, 59 L. R. A. 437, 94 Am. St. Rep. 323.

After developing these facts on cross-examination, the defendant objected to the admission of the testimony and moved that it be stricken, upon the grounds that it breached his right not to be required to furnish evidence against himself, and also moved that he be furnished with a complete transcript of the defendant's testimony before the Commission. The objection was overruled and the motion denied. The State had been using the transcript and had picked out only such parts as it desired to show. Other statements of the defendant may have qualified those shown. Part of the examination having been shown the defendant was entitled to the transcript to show such other parts as were relevant, and for cross-examination of the witness.

The defendant was entitled to the transcript and the court was in error in denying the motion.

While the admissions of the defendant, as shown, were not a confession, they were of such a nature that the rules applicable to the admission of a confession may guide us in this matter.

It is a well known rule of evidence, that a confession is prima facie admissible *where it appears on its face free and voluntary and there is no suggestion in the evidence to the contrary,* the burden being upon the defendant to rebut that presumption. State v. Icenbice, 126 Iowa 16, 101 N. W. 273; State v. Storms, 113 Iowa 385, 85 N. W. 610, 86 Am. St. Rep. 380; State v. Thomas, 193 Iowa 1004, 188 N. W. 689. But, in this case, the record is made by the State's witnesses entirely and it shows upon its face, and by evidence to the contrary, that the testimony was not voluntary before the Commission. The rule is that if the inducement or compulsion is "however slight," the testimony is not admissible. State v. Storms, State v Thomas, supra; Wilson v. United States, 162 U. S. 613, 16 S. Ct. 895, 40 L. Ed. 1090. There was no conflict in the evidence on this point. It was a question for the court, and not for the determination of the jury as is the case where the evidence is in conflict and the question of compulsion is in doubt. The objection to the admissibility of the State's testimony as to the evidence given by the defendant before the Military Commission should have been sustained. The fact that defendant may have testified voluntarily in the contempt proceedings, on July 14, 1938, would not be a waiver of his constitutional privilege before the Commission. Duckworth v. District Court, 220 Iowa 1350, 264 N. W. 715; 4 Wigmore on Evidence (2d Ed.), section 2276, page 910.

IV. The State also, by reporter and transcript, in its main case, put in evidence parts of the testimony of defendant elicited in his cross-examination in the contempt proceedings relative to the Maytag Company injunction of June 22, 1938. This cross-examination was on the day following the completion of the testimony and after the court had announced its decree. It was taken over the protest of defendant. Laying aside the

question of the rightfulness of the cross-examination, and directing attention to the character of the testimony, it appears to have been very largely with respect to the relations of defendant to the Communist Party, but in greater detail. We will refer to but one item in particular, his attending a convention of the Party during the pendency of the strike. This question was asked the defendant at the contempt hearing: "Now, I want to hand you Exhibit 'H', and call your attention to the paragraph blocked off there in red, reading: 'Kansas City, Mo., June 20—The Missouri State Convention of the Socialist party voted to hear Bill Sentner, communist party organizer, and to distribute the Communist United Front Appeal, to the delegates.' Does that refer to you, Mr. Sentner?" Questions of this type, and there were many of them, had no bearing upon the offense for which he was being tried. It was prejudicial error for the reasons pointed out in Division II hereof. It was also error to permit the witnesses, Padget and Shult, to give testimony that they heard similar evidence given at the contempt hearing.

V. When the defendant took the witness stand in this case, he was again cross-examined as to these same matters which had been introduced from the transcripts of testimony in the contempt and Military Court hearings, though it was not proper cross-examination and violated Code section 13892. What this court said relative to cross-examination for the purpose only of poisoning the minds of the jurors in State v. Burris, 194 Iowa .628, 636, 190 N. W. 38, and in State v. Scott, 194 Iowa 777, 784, 190 N. W. 370, has application here. The testimony should not have been admitted.

VI. Evidence was admitted of acts and statements done and said by persons not in the presence of the defendant, and at times when he was not in Newton. When objection was made to these offers of testimony, the court at times stated that the testimony would be admitted conditioned upon the defendant's connection with the matters being later shown. This testimony apparently was not admitted upon any theory that there was any conspiracy or concert of action in respect to these different matters between the defendant and the various

actors, but, as indicated by Instruction 11, the admission was made dependent upon whether these actors were members or officers of the local Union of the national or international organization of which defendant was an officer. This is indicated by the fact that all acts and statements by others were withdrawn from the jury. The jurors were further told that they might consider any such acts or statements of officers or members, for the sole and only purpose of revealing the effect on their minds and conduct, as a result of what the defendant may have said, if anything, relative to stirring up crime, sabotage, or violence as a means of accomplishing the changes or reforms they were seeking.

Where a conspiracy is charged, it is first incumbent upon the one charging to make a prima facie showing of the conspiracy by evidence independent of any acts or statements of any alleged co-conspirators. When this prima facie showing has been so made, admitted evidence of any acts or statements of other alleged co-conspirators made in furtherance of the conspiracy will be permitted to remain in the record as against the defendant, and not otherwise.

Likewise, where as in this case there is no charge of conspiracy or concert of action, and no evidence thereof, and only a charge against one individually in the commission of a crime consisting of the advocacy of certain conduct to accomplish a purpose, if there be independent evidence of the advocacy, evidence of the certain conduct may then be admitted as corroborative of the fact of advocacy. But the fact of the advocacy can never be established by evidence of the certain conduct alone. It cannot be presumed solely from the doing of the conduct that the defendant advised its being done to accomplish the purpose. Just what independent evidence is there of the advocacy of the defendant? With reference to the back-to-work injunction which restrained unlawful interference only with those interested in the movement, and related in no way to the employer's property, he stated that it was worthless, and that without regard to it they were not going to permit anybody to take their jobs. This cannot fairly be said to directly and unquestionably advocate the crime charged. Such advocacy is

inferable only. There is testimony that defendant advised the men of the Union, which advice was usually but not always followed. There is no direct proof here of the advocacy charged. There is no evidence of any kind, in this record, that the defendant ever expressly advocated by word of mouth, disobedience to the injunction procured by the Maytag Company on June 22, 1938. There is the testimony of Taylor that the defendant told him, when he inquired why the foremen were not permitted in the plant, that they always kept them out during strikes. On the occasion of the morning of June 23, the defendant was present, not far from the south entrance, when the men, union and non-union, were entering the plant, no witness heard him say anything to the men about going into or not going into the plant. Before the Military Commission, he testified that some of the boys told him some of the union men were scabbing, and he asked them why they did not go in and see for themselves what was happening. One witness testified that he made a motion for the men to come on. Two witnesses testified that he said he thought the men were justified in going in. This testimony was introduced, before the latter part of the indictment was stricken. We believe we have set out all testimony as to what the defendant said, including testimony before the Military Court, bearing upon the advocacy of the use of crime, etc. It may be seriously questioned whether anything he said, directly and expressly advocated criminal syndicalism. And that seems to have been the thought of the court since he told the jury in Instruction 8 that it was not essential to a conviction, to establish that the defendant "did personally and in express words advocate crime, etc." if the natural and reasonable effect of what he did say was to induce such acts, and it was so intended. We think that instruction is correct.

The overt act necessary to establish conviction was the fact of advocacy. Definite proof of express advocacy would have been sufficient in itself, and evidence of any concrete action or attempt to put in effect the advocacy would have been unnecessary, although admissible as corroboration of the advocacy and its natural effect, and thus indicate the intent of the advocate. Because the fact of advocacy must be largely inferred

from whatever the defendant said, it is our judgment that testimony of acts and statements of officers and members of the Union, otherwise relevant and material, not in the presence of the defendant, in connection with picketing and the sit-down strike was properly admitted as tending to show the reasonable and natural effect and intendment of what was said by the defendant.

Testimony was given of acts and statements of certain ones who were not shown to be members or officers of the Union, one of which acts was the throwing of the poster in the church. The defendant, at the close of the State's testimony, moved that such testimony be withdrawn. The motion was overruled. We think at that time the specific objectionable items of testimony should have been withdrawn and the jury then so told. Withdrawal by instruction to the jury in general language that they should consider only acts and statements of union men, given after argument, and several days after the admission of the testimony, was not an effective way of withdrawing this testimony and its effect from the minds of the jury. The vice of the method was indicated by the stress which the attorneys for the State laid upon the incident of the poster. This court has said that the order of the admission of testimony is largely in the discretion of the trial court; but we have also said that better practice requires that the evidence of the acts or statements of co-conspirators should not be admitted until the fact of the conspiracy has been prima facie established by independent testimony. State v. Priebe, 198 Iowa 609, 611, 199 N. W. 276; State v. Gilmore, 151 Iowa 618, 132 N. W. 53. In fairness to the defendant, and to eliminate chances of error, the practice recommended should be more strictly followed. In State v. Hartman, 213 Iowa 546, 239 N. W. 107, procedure of a similar nature was held to demand a new trial. It is, of course, not every act or statement of a co-conspirator, or, as in this case of a member or officer of the Union, which is admissible. The act or statement must be one that was ordinarily and reasonably apparent, or to have been anticipated, as a natural or likely consequence of the defendant's offense. Under all of the circumstances, we think that the procedure adopted in the admission

614

of the incompetent testimony and the manner of its withdrawal was unfair to the defendant to such an extent as to be reversible error.

■ VII. In his opening argument to the jury, the County Attorney stressed the connection of the defendant with the Communist Party. He stated: "The courts of this country have held that the Communist Party means the overthrow of your government. * * * The State thinks you can take that into consideration, his membership in that party as bearing on his motives in the city of Newton last summer. * * * We do not want it to get a toe hold in this country. * * * And you heard William Sentner testify that he had taken time out from the Maytag controversy to again go to St. Louis May 21st or 22d, 1938 to attend the state convention of the Communist party." Proper objection was made but overruled. Such argument was improper, and the error assigned is good.

■ VIII. There was little restriction upon the State in showing acts and language of the defendant in any way tending to support the indictment, particularly as bearing upon his intent. Much greater strictness was imposed upon the defendant in his attempts to show conduct and statements indicating a contrary or different intent. One of these incidents was the offer to prove the proposal of the defendant and the labor negotiating committee to the company committee to arbitrate and to be bound by the decision, and to accept the wage cut and go to work providing the cut would be restored if the operating profits were sufficient. These offers were made in May and were rejected. Another incident was the rejection of the offer to prove by the witness Steinberger what the stewards did to preserve order and property. Another incident was the rejection of testimony by Allison, the President of the Local, who with the defendant went to the Governor on the night of June 22d to secure an arbitration board to settle the controversy. Also in refusing the defendant's testimony that at the Logan conference he had told Logan of his offer to arbitrate and be bound by the arbitration. This was a part of the same conversation concerning which Logan was permitted to testify that defendant said if strike breakers were

brought in it might blow up the town. Logan said that this expression was not meant literally.

Under the record made, it was proper for the defendant to meet the evidence of the State respecting what the defendant said and did, and the intent and inferences deducible therefrom, by evidence from which a contrary intent and inferences were deducible. The court erred in rejecting these items of testimony and offers.

IX. The defendant insisted throughout the trial by proper procedure, that the statute under which he was prosecuted had no proper application to anything he may have done at Newton during the labor controversy, and that it was never the intention of the legislature that this statute should apply to the conduct of laboring men, whether unionized or not, in any action they might take by picketing, boycott, lockout, or possession of the plant, for the sole purpose of settling a dispute over wages, hours, or other labor conditions. He contends that by industrial reform, the legislature meant a revolutionary or radical change in the relations of capital and labor, a change in the system by which labor would take over production, do away with the wage system, and operate all production itself. These criminal syndicalism statutes were largely enacted in 1917 and the years immediately following during the height of the I. W. W. movement, and the defendant contends that they were intended to suppress that and like revolutionary movements. The State concedes that this is the first time that an attempt has been made to prosecute under this statute, in a labor controversy of this kind. No similar case has been cited by either side, and we have found none in an extensive independent research. The trial court stated that it was pioneering in the matter. That there was possibly some lingering doubt in the court's mind is indicated by the fourth paragraph of Instruction 9, in which the court stated: ''By the term 'industrial reform' *is ordinarily meant some radical change in industry or in industrial conditions, ownership, or management.* As used in the statute the words may mean that or somewhat less; as used in these instructions it means the seeking of a change in wages, improvement in working conditions, or a better form of contract of employment.

* * *.'' If, as the trial court states, the term ''industrial reform'' has the meaning stated in the first sentence of the paragraph, may it not be pertinently inquired if that was not the meaning the Legislature intended the words to have?

The members of the court are not in accord on the matter, and we do not determine it.

Other assignments of error have been considered but are not necessary to be passed upon.

The judgment is reversed for the reasons set out.—Reversed.

WENNERSTRUM and GARFIELD, JJ., concur.

MITCHELL and SAGER, JJ., concur in the result.

HALE, C. J., and MILLER and OLIVER, JJ., concur specially.

STIGER, J., concurs fully by special concurrence.

HALE, C. J. (specially concurring)—I concur in the result and agree that the case should be reversed on account of the admission of testimony as set out in the majority opinion. I cannot, however, agree with all of the statements in the opinion. Some matters I think should be noticed.

The defendant devotes a great deal of his argument to the application of the criminal-syndicalism statute to the facts charged in the case, and also as to the question of the constitutionality of the statute. These matters are not determined in the majority opinion and it may not be necessary to determine them, but considering the extensive argument of the defendant, I believe it is desirable that we determine the applicability of the statute to the present case. It is my opinion that the statute applies to just such a situation as is charged in the indictment, and that the crime of syndicalism should not be limited to apply only to movements which are nationwide in their extent; that it is the incitement to crime by one who, by word of mouth or writing, advocates or teaches the duty, necessity, or propriety of crime, sabotage, violence, or other unlawful means of terrorism, as a means of accomplishing industrial or political reform, which is condemned by the statute, and that whether the reform sought to be accomplished applies to one controversy or to more than one, or whether it is general or only as to one situation, can make no difference.

It has been suggested also that in the instant case the word ''reform'' could not apply, and that the intent of the legislature was that it should not apply to a case such as this. ''Reform,'' however, has a definite meaning: the amendment of what is defective, vicious, corrupt, or depraved; a removal or correction of an abuse, a wrong, or error; and as a verb: to amend, correct, improve; to amend or improve by change of form; removal of faults or abuses; to restore to a former good state; to bring from bad to good or from worse to better. Webster's New International Dictionary. In its general sense it means ''change.'' It has been legally defined as implying both the lessening of evil and the increasing of good (Little v. State ex rel. Huey, 137 Ala. 659, 35 So. 134, 136); to correct, to make new, to rectify (McCorquodale v. State, 54 Tex. Cr. Rep. 344, 98 S. W. 879, 211 U. S. 432, 435, 29 S. Ct. 146, 53 L. Ed. 269, 270). Clearly it would seem that practically any change having for its ultimate object an improvement of conditions or an advance in wages would come well within the definition of ''reform,'' and of course, if applied to wages or conditions of people employed in factories, would be industrial reform. Therefore it seems that the acts charged in the indictment come definitely within the provisions of section 12906 of the Code, which defines criminal syndicalism as the doctrine which advocates crime, sabotage, violence, or other unlawful means of terrorism as a means of accomplishing industrial or political reform, and such acts so charged are within the provisions of Code section 12907, which forbids advocating or teaching the duty, necessity, or propriety of such unlawful acts, and includes controversies between employer and employee, or labor disputes. I would therefore hold that the court was right in its instruction No. 9, and that, as qualified, it brought the offense within the terms of the statute. It is not necessary, and I do not think there is any authority for the statement, that the statute must be so interpreted as to contemplate some fundamental change general or universal in extent. It is true and a matter of general knowledge that the I. W. W. contemplated radical changes in or disruption of the whole industrial structure, but convictions have been sustained where no such question entered into the case. In the present

case there was a sit-down strike, accompanied by violence. That the violence and sabotage were not of great extent was fortunate. The only question is whether or not the unlawful acts were inspired, or as the State says advocated, by the defendant. My conclusion must be that the statute applies to the present case; that it is not necessary to show that the defendant advocated the overthrow of the government or the abolition of the capitalistic and wage system, and that the crime of criminal syndicalism does not require any such extreme limitation.

The question of the constitutionality of the statute arose frequently during the trial and is argued extensively by the defendant, who makes his third assignment of error as follows:

"Sections 12906 and 12907, Code of Iowa, 1935, are so generally vague, indefinite and uncertain, and contain no statements of fact or law constituting the offense charged in ordinary and concise language that would enable a person of common understanding to know what was intended by the statute, and are, therefore, void and unconstitutional, and contravene and are repugnant to the rights guaranteed the defendant by the Fifth and Fourteenth Amendments to the Constitution of the United States, and sections Nine and Ten, Article One, of the Constitution of the State of Iowa, and therefore, the court was in error when it overruled the defendant's motion to set aside the indictment, the demurrer and motion to direct a verdict of not guilty made at the close of the State's case and at the close of the entire case, upon the grounds therein mentioned."

The principal claim, therefore, in this assignment of error is that the statutes are not so framed as to afford due process of law as required by the constitutional provisions referred to. I think that we should take notice of this assignment of error.

The question of the right of free speech is referred to. I do not think such question enters into the case. No one can or should consent to any abridgment of that right. But such right is not denied by laws which punish its abuse, or interference with the rights of others. We have laws forbidding slander, libel, and conspiracy, immoral plays and books, malicious threats, interference with the administration of justice, and many others,

and no one contends. that they deprive us of our constitutional rights.

Defendant cites various authorities that criminal statutes are to be strictly construed, and that penal statutes should not admit of such double meaning that citizens may act upon one conception of their requirements and the courts upon another. About this there can be no question. Defendant cites various cases, both in his original and reply argument. I merely refer to them: Yu Cong Eng v. Trinidad, 271 U. S. 500, 46 S. Ct. 619, 70 L. Ed. 1059, involving a Philippine statute known as the Chinese Bookkeeping Act; State v. Tonn, 195 Iowa 94, 191 N. W. 530, but the constitutional question is not there discussed except in a dissenting opinion in which the writer states that it is unnecessary for the purposes of his dissent. Defendant also cites Connally v. General Construction Co., 269 U. S. 385, 46 S. Ct. 126, 70 L. Ed. 322, which involved a statute requiring the current rate of wages; Cline v. Frink Dairy Co., 274 U. S. 445, 47 S. Ct. 681, 71 L. Ed. 1146, a price-fixing statute; Collins v. Kentucky, 234 U. S. 634, 34 S. Ct. 924, 58 L. Ed. 1510; International Harvester Co. v. Kentucky, 234 U. S. 216, 34 S. Ct. 853, 58 L. Ed. 1284, also a price-fixing statute. None of these cases supports his argument. Neither does Lanzetta v. New Jersey, 306 U. S. 451, 59 S. Ct. 618, 83 L. Ed. 888, in which case a statute providing for the punishment of gangsters is obviously indefinite. The case of Tedrow v. Lewis & Son Dry Goods Co., 255 U. S. 98, 41 S. Ct. 303, 65 L. Ed. 524, which follows the opinion in United States v. Cohen Grocery Co., 255 U. S. 81, 41 S. Ct. 298, 65 L. Ed. 516, also involving a price-fixing statute, also is cited. United States v. Reese, 92 U. S. 214, 23 L. Ed. 563, referred to appropriate legislation to carry into effect the Fifteenth Amendment to the Constitution. None of these cases refers to any holding of any court in regard to criminal-syndicalism statutes. Several other cases are cited, including De Jonge v. State of Oregon, 299 U. S. 353, 57 S. Ct. 255, 81 L. Ed. 278, which held that the Oregon statute as applied to the particular charge as defined by the state court is repugnant to the due-process clause of the Fourteenth Amendment. The charge was limited to defendant's participation in a meeting called by the communist party, and the opinion sets out that

the court sustained the conviction upon that basis regardless of what was said or done at the meeting. Chambers v. State of Florida, 309 U. S. 227, 60 S. Ct. 472, 84 L. Ed. 716, was based on a confession improperly obtained. Carlson v. People of State of California, 310 U. S. 106, 60 S. Ct. 746, 84 L. Ed. 1104, involved a county ordinance forbidding the display of banners. Thornhill v. State of Alabama, 310 U. S. 88, 60 S. Ct. 736, 84 L. Ed. 1093, was a picketing case. Fiske v. State of Kansas, 274 U. S. 380, 47 S. Ct. 655, 71 L. Ed. 1108, was reversed for the reason that the supreme court will review the finding of facts by a state court where a federal right has been denied as the result of a finding shown by the record to be without evidence to support it; and the syndicalism act in that case was applied to sustain the conviction on the evidence, without any charge or evidence that the organization in which the defendant secured members advocated any crime, violence, or other unlawful acts, and that thus applied the act was an arbitrary and unreasonable exercise of police power. In Herndon v. Lowry, 301 U. S. 242, 57 S. Ct. 732, 81 L. Ed. 1066, a conviction under a statute of Georgia was reversed, but the application of the statute was what was condemned. It was not the statute which was held to be a violation of the right of free speech so much as the application of it to the facts in the case.

The constitutionality of the criminal-syndicalism statutes has often been assailed, but we do not think that in any case the statutes have been held invalid for the reasons urged by the defendant in his brief. A number of cases have arisen involving their constitutionality, and I merely refer to them here. See, State v. Moilen, 140 Minn. 112, 167 N. W. 345, 1 A. L. R. 331; State v. Quinlan, 86 N. J. L. 120, 91 A. 111; State v. Boyd, 86 N. J. L. 75, 91 A. 586; State v. Fox, 71 Wash. 185, 127 P. 1111, subsequently affirmed in 236 U. S. 273, 35 S. Ct. 383, 59 L. Ed. 573; State v. Holm, 139 Minn. 267, 166 N. W. 181, L. R. A. 1918C, 304 (relating to a statute making it a criminal offense to advocate that men should not enlist in the military forces); People v. Most, 171 N. Y. 423, 64 N. E. 175, 58 L. R. A. 509 (sustaining a statute prohibiting the publication of an article advocating the murder of rulers by poison and dynamite). See, also, People v.

Gitlow, 234 N. Y. 132, 136 N. E. 317, 268 U. S. 652, 45 S. Ct. 625, 69 L. Ed. 1138; Ex parte McDermott, 180 Cal. 783, 183 P. 437; People v. Malley, 49 Cal. App. 597, 194 P. 48; People v. Steelik, 187 Cal. 361, 203 P. 78; People v. Taylor, 187 Cal. 378, 203 P. 85; Whitney v. People of State of California, 274 U. S. 357, 47 S. Ct. 641, 71 L. Ed. 1095; State v. Worker's Socialist Pub. Co., 150 Minn. 406, 185 N. W. 931; Application of Moriarity, 44 Nev. 164, 191 P. 360; State v. Laundy, 103 Or. 443, 204 P. 958. The foregoing cases apply more particularly to what may be termed seditious acts, except as to the New Jersey case. Syndicalism as a crime has been expressly passed upon in various cases and in several states. See State v. Hestings, 115 Wash. 19, 196 P. 13; State v. Hemhelter, 115 Wash. 208, 196 P. 581; People v. McClennegen, 195 Cal. 445, 234 P. 91; People v. Wagner, 65 Cal. App. 704, 225 P. 464; People v. Cox, 66 Cal. App. 287, 226 P. 14; Burns v. United States, 274 U. S. 328, 47 S. Ct. 650, 71 L. Ed. 1077; State v. Dingman, 37 Ida. 253, 219 P. 760; People v. Ruthenberg, 229 Mich. 315, 201 N. W. 358 (writ of error dismissed, 273 U. S. 782, 47 S. Ct. 470, 71 L. Ed. 890); Berg v. State, 29 Okla. Cr. Rep. 112, 233 P. 497.

For the reasons given and from an examination of the foregoing cases, which assailed the constitutionality of the statute from nearly every angle, I would hold that the statute as enacted is constitutional and is applicable to the charges made in this case.

I am authorized to say that JUSTICES MILLER and OLIVER join in this special concurrence.

STIGER, J. (specially concurring)—I concur in the majority opinion. However, I am of the opinion the trial court erred in overruling defendant's motion for a directed verdict on the ground the evidence was insufficient to establish the charge that defendant advocated crime, sabotage, violence or other unlawful methods of terrorism as a means of accomplishing *industrial or political reform.*

An important issue in this case is the meaning of the words "industrial or political reform."

Appellant contends the Legislature meant the advocacy of a fundamental change by violence and crime in our present in-

dustrial system, the abolition of the capitalistic or wage system, the overthrow of our form of government. I agree with defendant's interpretation.

The State asserts that the Legislature intended the phrase to apply to controversies between an employer and employee, to labor disputes, to the attempt of labor to secure higher wages or better working conditions. Plaintiff states:

"The term 'reform' meaning to reorganize, to rearrange, to correct, amend, rectify or improve and implies the lessening of evil or increasing of good which, if applied to industry, could mean any change or improvement in the relationship between employer or employee."

On this question, the court, in instruction No. 9, said:

"By the term 'industrial reform,' is ordinarily meant some radical change in industry or in industrial conditions, ownership, or management. As used in the statute the words may mean that or somewhat less; as used in these instructions it means the seeking of a change in wages, improvement in working conditions, or a better form of contract of employment. But you should keep in mind that these things of themselves are lawful, and may lawfully be sought by peaceful means, and only become unlawful when accompanied by crime, sabotage, violence or other unlawful methods of terrorism."

I am of the opinion the court erred in holding that the term "industrial reform" was used in the statute in a sense contrary to its ordinary and usual meaning, which, as stated by the trial court, "is ordinarily meant some radical change in industry or in industrial conditions, ownership, or management."

This prosecution grows out of a strike called by the negotiating committee of the Local No. 1116 United Electrical Radio and Machine Workers of America pursuant to a dispute over a new wage contract with the Maytag corporation. Defendant was called to Newton by the committee to assist in settling the dispute and negotiate a new contract.

The record shows that whatever defendant did or said at

Newton was for the purpose of obtaining a favorable wage contract for the union.

There is nothing in the statutes or in the history of the statutes that even suggests that the Legislature, in using the words "industrial reform," meant anything less than a fundamental change in our industrial system and such change by violence and crime constitutes "criminal syndicalism."

The criminal syndicalism law was enacted by the 38th General Assembly in 1919, over 21 states adopting similar laws about this time. Some of the syndicalism laws used the words "industrial change or revolution"; some used "industrial reform." It is common knowledge that the laws were enacted in the several states pursuant to an aroused public opinion against the Industrial Workers of the World caused by the conduct of this organization and its members during the World War. Judicial notice should be taken of the fact that the several criminal syndicalism laws, including the Iowa enactment, were directed against this radical subversive group which advocated and sought to bring about violent changes in our industrial and political systems. The Legislature did not contemplate that the criminal syndicalism law would be used as a weapon by the State against workmen and labor unions in labor disputes during which the laboring man or union officers and organizers may have committed acts of violence, unlawful acts, in their attempt to advance the welfare of labor through better working conditions and higher wages.

In A History of Criminal Syndicalism Legislation In The United States by Eldridge Foster Dowell, published by the Johns Hopkins Press in 1939, it is stated on page 21:

"The criminal syndicalism laws of every one of the twenty states and two territories which enacted this type of legislation were passed in the brief period from 1917 to 1920, with the exception of a few amendments enacted later. This legislation was, in practically every case, enacted to suppress a revolutionary industrial union known as the Industrial Workers of the World. The western states in which these laws and bills first appeared were the strongholds and bitterest battlegrounds of the I. W.W."

. • I quote from the preamble of the I. W. W. Constitution, as amended in 1908, found on page 26 of the above authority:

"Between these two classes (employing and working classes) a struggle must go on until the workers of the world organize as a class, take possession of the earth and the machinery of production, and abolish the wage system.

"We find that the centering of management of the industries into fewer and fewer hands makes the trade unions unable to cope with the ever growing power of the employing class. The trade unions foster a state of affairs which allows one set of workers to be pitted against another set of workers in the same industry, thereby helping defeat one another in wage wars. Moreover, the trade unions aid the employing class to mislead the workers into the belief that the working class have interests in common with their employers.

"These conditions can be changed and the interest of the working class upheld only by an organization formed in such a way that all its members in any one industry, or in all industries if necessary, cease work whenever a strike or lockout is on in any department thereof, thus making an injury to one an injury to all.

"Instead of the conservative motto, 'A fair day's wage for a fair day's work,' we must inscribe on our banner the revolutionary watchword, 'Abolition of the wage system.'

"It is the historic mission of the working class to do away with capitalism. The army of production must be organized, not only for the every-day struggle with capitalists, but also to carry on production when capitalism shall have been overthrown."

For other references to the preamble, see Fiske v. Kansas, 274 U. S. 380, 47 S. Ct. 655, 71 L. Ed. 1108; Anderson v. United States, 269 F. 65.

Syndicalism is defined in Syndicalism, Industrial Unionism and Socialism by John Spargo on page 13 in the following language:

"Syndicalism is a form of labor unionism which aims at the abolition of the capitalist system based upon the exploita-

tion of the workers, and its replacement by a new social order free from class domination and exploitation. Its distinctive principle as a practical movement is that these ends are to be attained by the direct action of the unions, without parliamentary action or the intervention of the State. The distinctive feature of its ideal is that in the new social order the political State will not exist, the only form of government being the administration of industry directly by the workers themselves.

"Here or there may be found a Syndicalist to whom some part of this definition may not be acceptable, for. Syndicalism is in the process of making, as it were, and is for that reason not capable of rigid definition. On the whole, our definition will probably be acceptable to the vast majority of Syndicalists.

"It will be seen that Syndicalism is primarily an amalgam of Anarchist and Socialist theories. * * *

"All Syndicalists agree that in the new social order toward which they are striving the political State will have no place. There is complete agreement that the only government which will be necessary will be the government of industry, of production and distribution, and that this will be carried on directly by the workers themselves."

In State v. Tonn, 195 Iowa 94, 120, 191 N. W. 530, 541, defendant was convicted of the crime of criminal syndicalism. Justice Weaver dissented from the conclusion reached in the majority opinion relative to the admissibility of evidence obtained by seizure and search of defendant's property. However, in the course of his dissent, Justice Weaver, though admitting that his remarks about the criminal syndicalism statute were unnecessary for the purposes of his dissent, states in regard to this law:

"It is the product of conditions created by the recent world war—an extraordinary piece of legislation which finds its moral justification, if any it has, in the exercise of the war power of the state for its protection against the machinations of its enemies from within its borders, as well as from without. Since it was devised for such commendable purposes, the average loyal citizen yielded cheerful obedience thereto, and few, if any, were disposed to object to its enforcement. With the return of peace,

many have felt that the statute in at least some of its features has outlived its usefulness, and should be repealed or materially modified. In many respects, this statute is not unlike the Alien and Sedition Laws which were enacted by Congress in 1798, in anticipation of a threatened war with France, and which were the subject of much political strife. They were, however, enacted as temporary measures, and expired by their own limitation in two years. Had the present act been made to expire with the return of settled peace, few just criticisms would now be heard of such legislation. It is, nevertheless, true that, as a piece of permanent statutory law, it contains much which is ill adapted to normal conditions of society in a republican or democratic form of government, and many of its provisions, from their very obscurity and vague and boundless generalities, afford material for endless trouble. No conviction under it should be sustained, unless it be upon the clearest and most satisfactory evidence, and in my judgment, the case made by the State falls far short of this requirement.''

It is apparent from the record that the defendant in all that he did and said was attempting and attempting only to secure a favorable wage contract for the union with the company and a settlement of the strike and this does not constitute a felony, the crime of criminal syndicalism, although it may be conceded that defendant was responsible for the sit-down strike, the negligible alleged sabotage, and stated that the injunction was not worth the paper it was written on. There is no vestige of evidence that he advocated the overthrow of government or abolition of the capitalistic and wage system.